**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| JOSEPH R. MULLINS, | ) | Case No. 19-11574-CJP |
| | ) | |
| Debtor | ) | |
| | ) | |

**FINDINGS OF FACT AND RULINGS OF LAW REGARDING HYPOTHETICAL
LIQUIDATION SOLVENCY FOR PURPOSES OF THE "BEST INTERESTS OF
CREDITORS" TEST UNDER 11 U.S.C. § 1129(a)(7)(A)(ii)**

Michael Corcoran, as personal representative of the estate of the late Joseph E. Corcoran,

("Mr. Corcoran") and Gary A. Jennison ("Mr. Jennison," together with Mr. Corcoran, "C&J")

object (Dkt. No. 478) (the "Objection") to confirmation of the *Second Amended Plan of*

*Reorganization of Joseph R. Mullins, as Modified* (Dkt. No. 333) (the "Plan") proposed by

Joseph R. Mullins ("Mr. Mullins" or the "Debtor"). Upon consideration of the Plan, the

Objection, the Debtor's memorandum of law in support of the Plan (Dkt. No. 479) (the

"Memorandum of Law"), C&J's reply to the Memorandum of Law (Dkt. No. 506) (the

"Reply"), the Joint Prehearing Report (Dkt. No. 483) containing a list of agreed facts (the

"Agreed Facts"), the testimony of the witnesses and documentary evidence admitted at a five-

day evidentiary hearing (the "Trial"), the Debtor's *Proposed Findings of Fact and Conclusions*

*of Law* (Dkt. No. 544) (the "Debtor's Post-Trial Memorandum"), *C&J Creditors' Post-Trial*

*Memorandum and Proposed Findings of Fact and Rulings of Law In Support of Entry of an*

*Order Denying Plan Confirmation for Failure to Satisfy 11 U.S.C. § 1129(b) (Fair and*

*Equitable Requirements) and 11 U.S.C. § 1129(a)(7) (Best Interests of Creditors Test)* (Dkt. No.

545) (the "C&J Post-Trial Memorandum"), the arguments made by counsel, and the entire record

in this case, pursuant to Fed. R. Civ. P. 52, as made applicable to this contested confirmation

matter by Fed. R. Bankr. P. 9014 and 7052, I make the following findings of fact and rulings of

law regarding whether the Debtor is insolvent in the context of a hypothetical liquidation for

purposes of the "best interests of creditors" test under § 1129(a)(7)(A)(ii)[1] and conclude that the

Debtor is "liquidation solvent."[2]  As a result of this finding and because an impaired class of

creditors has voted to reject the Plan, in a separate decision, which I refer to as the "Best Interests

and Fair and Equitable Decision" in this decision, I have considered whether the Debtor has met

his burden to demonstrate that the Plan satisfies the "best interests" test pursuant to §

1129(a)(7)(A)(ii), as well as whether the Plan is "fair and equitable" as to the rejecting class of

general unsecured creditors as required by § 1129(b).[3]

## I.    OVERVIEW AND BACKGROUND

On May 8, 2019 (the "Petition Date"), Mr. Mullins filed a Chapter 11 bankruptcy case.

The Debtor's Plan provides that creditors in Class 6 (nonpriority unsecured claims), which

includes C&J, are impaired and will receive a dividend of 100% of the allowed amount of their

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C.
§§ 101, *et seq.*, as amended (the "Bankruptcy Code" or "Code").

[2] To the extent any conclusion of law is labeled as a finding of fact, but is actually a conclusion of law (or
the opposite), it is adopted as such.

[3] Because an impaired class has voted to reject the Plan, the Plan may be confirmed only if it (i) satisfies
every applicable provision of § 1129(a), other than subsection (a)(8), and (ii) does not discriminate
unfairly and is "fair and equitable" with respect to as to the rejecting general unsecured creditors in Class
6. *See* 11 U.S.C. § 1129; *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639,
641–42 (2012). As the plan proponent, the Debtor bears the burden of proof by the preponderance of the
evidence. *See, e.g., In re Salem Suede, Inc.*, 219 B.R. 922, 932 (Bankr. D. Mass. 1998). I also have an
independent obligation to ensure that the Plan satisfies confirmation requirements. *See id.*

claims with interest accrued through the Petition Date and that will accrue at a specified rate after

the effective date of the Plan.  The Plan does not provide for the payment of interest on such

claims for the period that the Debtor's case has been pending through the effective date of the

Plan ("pendency interest").  The Debtor asserts that I should determine that Class 6 creditors

would only receive a dividend of 96.89% if his estate were to be liquidated under Chapter 7 and,

as such, those creditors would not be entitled to receive payment of any pendency interest in a

hypothetical liquidation.  *See* Debtor's Post-Trial Memorandum ¶ 79. As set forth in the

Objection, C&J assert that the Debtor is significantly solvent on a liquidation basis. C&J are the

dominant creditors in Class 6, as the parties have stipulated that the overall amount of Class 6

claims totals $20,112,052 as of the Petition Date and C&J's judgment claims against the Debtor

are in the aggregate amount of $19,399,416 as of that same date.[4]  *See* Stipulation by Debtor

Joseph R. Mullins and Joseph Corcoran and Gary Jennison with Respect to the Calculation of

Potential Pendency Interest (the "Pendency Interest Stipulation"), Dkt. No. 540.  C&J were the

only creditors to vote in Class 6 and they voted to reject the Plan. Report on Plan Voting, Trial

Ex. 5.

    Section 1129(a)(7)(A)(ii) permits a plan to be confirmed, despite rejection by an impaired

class, if each holder "will receive or retain under the plan on account of such claim or interest

property of a value, as of the effective date of the plan, that is not less than the amount that such

holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on

such date." 11 U.S.C. § 1129(a)(7)(A)(ii). Known as the "best interest of creditors" test, §

---

[4] The judgments of Mr. Corcoran and Mr. Jennison total $13,171,497.52 and $4,369,645.13, respectively, and the judgment amounts with accrued interest as of the Petition Date total $14,566,859.62 and $4,832,556.60. *See* Corcoran Proof of Claim 4-3, Trial Ex. 8; Jennison Proof of Claim 5, Trial Ex. 9; Stipulation by Debtor Joseph R. Mullins and Estate of Joseph Corcoran, Gary Jennison and the Debtor with Respect to Judgment Amounts Through May 7, 2019, Dkt. No. 527.

1129(a)(7)(A)(ii) requires that the dissenting members of an impaired class receive at least what they would receive in a Chapter 7 liquidation of a debtor. Where an estate is solvent, the distribution scheme under § 726(a)(5), which is made applicable to a Chapter 11 case by § 1129(a)(7), requires postpetition interest to be paid on all allowed unsecured claims "at the legal rate" from the petition date until the payment of such claims. *See id*. § 726(a)(5) (stating "property of the estate shall be distributed . . . fifth, in payment of interest at the legal rate from the date of the filing of petition on any claim . . . "). The payment of postpetition interest if a Chapter 11 debtor is liquidation solvent is not controversial, but the rate of interest to be used is unsettled as the Bankruptcy Code does not define "the legal rate." In order to determine whether the Debtor is required to provide for pendency interest to Class 6 creditors, I must determine whether the Debtor is solvent in a hypothetical liquidation.

The parties have introduced evidence regarding the net liquidation value of the Debtor's assets, including the affidavit and expert report of Stephen B. Darr (Dkt. No. 484) (the "Darr Report"),[5] admitted as Trial Ex. 47, the direct testimony on valuation in the form of an expert affidavit of Gary Blumenthal (the "Blumenthal Aff.") and the expert report of Mr. Blumenthal, Felix S. Betro, and Betro and Company, P.C. (the "Betro Report"), both filed at Dkt. No. 485 and the Betro Report admitted as Trial Ex. 28, as supplemented by Trial Ex. 55, Updated Exhibit 1.0--Recap of Joseph R Mullins Net Assets Available to Repay Creditors as of June 30, 2020 to Betro Report ("Updated Betro Report Ex. 1.0"),[6] and the direct testimony in the form of an expert affidavit of Donald Lassman, Esq. (Dkt. No. 482) (the "Lassman Affidavit"), admitted as

---

[5] Page references to the Darr Report are made to the page numbers included in the header of the report.

[6] Although the parties did not mark the Blumenthal Affidavit, which constituted Mr. Blumenthal's direct testimony, as an exhibit, they explicitly agreed on the record it was in evidence and I stated I would take judicial notice of the affidavit. Trial Tr. (Day 5 (Blumenthal)), 9:19–22, 10:1–4, 16–20.

Trial Ex. 33.  Each of the expert witnesses also testified at trial, as did Mr. Mullins, Kayla

Lessin,[7] the asset manager for the Debtor's management company, Mullins Management

Company, and Karen Meyer, an employee of CMJ Management Company ("CMJ

Management"), who has had a number of tax-related and other roles with the company. *See* Trial

Tr. (Day 1 (Lessin)), 102:7–14; Tr. (Day 2 (Lessin)), 11:13–20; Trial Tr. (Day 3 (Meyer)),

111:9–13, 17–20.  In coming to a determination regarding the hypothetical liquidation value of

the Debtor's assets, I have considered the expert reports, testimony, documentary evidence, and

have utilized my experience in assessing asset liquidations and related costs, including legal fees

associated with Chapter 7 liquidations.  I have also assessed the relevant experience of the

experts, the sources, and reasoning utilized by Messrs. Darr and Blumenthal in determining the

discounts used in their valuations and by Messrs. Darr and Lassman in estimating the legal fees

that would be incurred by a Chapter 7 trustee in a hypothetical liquidation of the Debtor's assets.

Mr. Mullins's assets are comprised primarily of a variety of fractional interests in entities

that own direct and indirect interests in mature and "stabilized" multi-unit affordable housing

developments that produce cash distributions from rental income and refinancing proceeds.  *See*

Blumenthal Aff. ¶ 22; Trial Tr. (Day 3 (Darr)), 48:11–24; Trial Tr. (Day 1 (Lessin)), 110:2–13,

114:6–15; Schedule B at 5–19, Trial Ex. 1. The experts organized the Debtor's assets into the

same categories, although some categories had slightly different names in the expert reports. *See*

Darr Report 198; Betro Report, Ex. 1.0; Updated Betro Report Ex. 1.0.  For purposes of these

findings, I will reference the category names used in the Darr Report – "cash," "JRM[8] real

---

[7] The Debtor also filed an affidavit of Ms. Lessin (Dkt. No. 487) (the "Lessin Affidavit"), which was not
admitted into evidence, but various exhibits to the Lessin Affidavit were separately admitted. See Exs. A–
C to Lessin Aff., Trial Exs. 39–41.

[8]  JRM refers to Mr. Mullins.

estate," "JRM personal property," "CMJ[9]/CMJ Management Stock," "CMJ Entities Interest[s],"

"Mullins Entities Interest[s]," "KC II[10] Reimbursement" claim (a hypothetical claim that will

arise upon payment made on Mr. Mullins's limited guaranty associated with a Massachusetts

Housing Finance Agency ("MHFA") loan relating to the KC II development), and "JRM Loans"

(a collection of "loans" carried on the books of entities developed by the Debtor in which he has

various interests).  Darr Report 198.

      Both Messrs. Darr and Blumenthal utilized, as a starting point, the Debtor's

representation of the nature of his interests in these various assets and his calculation of the fair

market value (before valuation discounts) of those interests as prepared by Ms. Lessin.  *See* Trial

Tr. (Day 2 (Darr)), 121:19–23, 140:10–141:5, 146:15–24, 172:12–173:3; Trial Tr. (Day 5

(Blumenthal)), 18:12–25, 20:7–25, 37:24–38:1; *see also* Trial Tr. (Day 2 (Lessin)), 12:23–13:5,

23:25–24:9, 34:20–24, 35:9–20, 39:2–11; Schedule B at 5–19, Trial Ex. 1; Ex. C to Lessin Aff.,

Trial Ex. 41. Ms. Lessin testified as to her process in assembling the entity valuations, which

were based on discounted cash flow analyses or appraisals depending on the asset. *See* Trial Tr.

(Day 1 (Lessin)), 108:12–16, 109:7–20, 140:24–141:4; Trial Tr. (Day 2 (Lessin)), 21:21–22:6,

26:9–21, 39:2–11, 15–17.  While not necessarily agreeing with or opining on capitalization rates

used by Ms. Lessin, each expert utilized her entity valuations.  *See* Trial Tr. (Day 2 (Darr)),

121:19–23, 140:10–141:5, 146:15–24, 172:12–173:3; Trial Tr. (Day 5 (Blumenthal)), 18:12–25,

20:7–25, 37:24–38:1. Each expert then applied a 10% orderly liquidation discount and assumed a

10% cost of sale reduction in proceeds in a hypothetical liquidation for substantially all assets.

---

[9]  CMJ refers to Corcoran, Mullins, Jennison, Inc.

[10]  KC II refers to Kimball Court Apartments II L.P.

*See* Trial Tr. (Day 2 (Darr)), 138:8–139:3; Blumenthal Aff. ¶¶ 29, 33;  Trial Tr. (Day 5

(Blumenthal)), 19:2–24, 21:18–22:1.

Where the experts differed significantly was in their opinions regarding the appropriate

Discount for Lack of Control ("DLOC") and Discount for Lack of Marketability ("DLOM") to

be applied in estimating the net value of the Debtor's assets that would likely be obtained in a

hypothetical Chapter 7 liquidation. *See, e.g.*, Darr Report 24, 30; Betro Report 8–10, 12; Trial Tr.

(Day 5 (Blumenthal)), 71:10–20. Valuation is not an exact science and predicting an appropriate

DLOC and DLOM for assets where a debtor holds fractional and minority interests in a

liquidation can result in substantial disagreement among experts with a possible range of

alternatives.  Here, the experts applied a range of discounts to various assets.  Most often, Mr.

Blumenthal applied a DLOC and DLOM that were each 10% less than those applied by Mr.

Darr, resulting in substantially higher orderly liquidation values.[11]  Each expert addressed the

variance by explaining their respective methodologies in applying various factors, including the

relevance and significance of studies referenced in their reports and testimony.  While both

experts have extensive general valuation experience, and Mr. Darr has significant experience in

bankruptcy cases, including liquidations in Chapter 7, *see* Betro Report 24–26; Trial Tr. (Day 5

(Blumenthal)), 14:10–16:16; Darr Report 82; Trial Tr. (Day 2 (Darr)), 118:3–119:17, neither had

any experience valuing fractional interests in entities owning rental properties or liquidating

those types of interests, *see* Trial Tr. (Day 3 (Darr)), 42:23–43:5, 66:18–67:3; Trial Tr. (Day 5

(Blumenthal)), 16:12–16, 61:13–63:9, 67:14–19, 70:8-24.

---

[11] Most often, Mr. Darr applied a DLOC and DLOM of 15% and 25%, respectively, while Mr.
Blumenthal applied a DLOC and DLOM of 5% and 15%, respectively. *See, e.g.*, Darr Report 24, 30;
Betro Report 8–10, 12.

After determining the orderly liquidation value for each asset and applying discounts,

each expert reduced projected hypothetical proceeds of a Chapter 7 liquidation by deducting

obligations secured by liens on those assets, accrued Chapter 11 expenses, and projected Chapter

7 costs of liquidation.  Mr. Darr relied on his experience and observations in bankruptcy cases to

estimate legal fees that would be incurred by a Chapter 7 estate in a hypothetical liquidation. *See*

Darr Report 198; Trial Tr. (Day 2 (Darr)), 118:9–119:17, 153:1–8. Mr. Blumenthal relied on the

expert report prepared by Mr. Lassman, an experienced Chapter 7 trustee, in estimating those

costs.  *See* Trial Tr. (Day 5 (Blumenthal)), 46:15–17. Each of the experts also relied on certain

legal assumptions provided by counsel to their respective clients in assessing discounts to be

applied to certain assets. *See, e.g.*, Trial Tr. (Day 5 (Blumenthal)), 23:25–24:5; 125:1–5. The

parties stipulated that there would be no tax liability to the Debtor or his bankruptcy estate in a

hypothetical liquidation under any scenario contemplated by their experts. *See* Stipulation, Dkt.

No. 512, ¶ 1.

In their reports admitted at Trial, each expert opined to an amount of proceeds that would

be available to pay Class 6 creditors in a hypothetical liquidation based on their applied

assumptions and discounts.  Mr. Darr estimated that a hypothetical liquidation as of

November 30, 2020 would generate $29,660,676 in cash available for distribution to Class 6

creditors, which he estimated would result in a 98.54% dividend using an unsecured claim

amount of $30.1 million.[12]  Darr Report 198. Mr. Blumenthal opined that a hypothetical

---

[12] The MHFA filed a claim in the amount of $10 million based upon the Debtor's limited guaranty of the
obligations of KC II to MHFA evidenced by a mortgage note and a swap note. *See* Proof of Claim 10, as
amended, Trial Ex. 10; Trial Exs. 15–16. I entered an order on motions filed by Mr. Mullins and MHFA,
through which they sought a determination that MHFA is impaired under the Plan, finding that the
MHFA claim was impaired and allowed in the amount of $10 million for all purposes related to
confirmation of the Plan. *See* Ord., Dkt.  No. 434. The MHFA claim is treated under Class 8 of the Plan,
but would be a general unsecured claim in a hypothetical liquidation and Messrs. Darr and Blumenthal

8

liquidation as of June 30, 2020 would generate $44,980,634 in cash available for distribution to

Class 6 creditors, which he estimated would result in a 100% dividend using a total unsecured

claim amount of approximately $33,081,994, which amount included postpetition interest at the

state judgment rate on C&J's claims.  Updated Betro Report Ex. 1.0. Mr. Blumenthal testified

that the cash available for distribution should be adjusted by adding $1.7 million after giving

effect to changes in net asset value of entities owning Cobble Hill Apartments, Kings Lynne

Apartments, and Colonel Lovell's Gate Apartments due to postpetition refinancings (as similarly

addressed in Exhibit E to the Darr Report).  Trial Tr. (Day 5 (Blumenthal)), 49:6–15; Betro

Report, Exs. 8.0.1–8.0.3; Darr Report Ex. E.  Mr. Blumenthal also testified that, in his opinion, if

a hypothetical trustee pursued an "alternative" to cause a sale of the assets of Massachusetts

Mills I L.P. ("Mass. Mills I") and Massachusetts Mills II L.P. ("Mass. Mills II," together, "Mass.

Mills") would result in an additional $1.9 million being collected on account of loans "due" to

Mr. Mullins. Trial Tr. (Day 5 (Blumenthal)), 57:12–24.  Mr. Blumenthal testified that the cash

available for distribution in a hypothetical liquidation could be as much as $49 million. *See id*. at

58:12–18.

Post-Trial, I asked the parties to stipulate to or provide an updated estimate of the amount

of Chapter 11 administrative expenses in the context of the Chapter 7 hypothetical liquidation

closer in time to the potential plan effective date in the context of their proposed findings of fact

and conclusions of law. As a result, Mr. Darr submitted an updated amount for Chapter 11

administrative expenses through January 31, 2021, which also necessitated changes to

encumbered and unencumbered cash in his liquidation analysis set forth in Exhibit F to the Darr

Report as described in the Debtor's Post-Trial Memorandum.  *See* Debtor's Post-Trial Memo. ¶¶

---

each included that claim in their liquidation analyses in the total amount of unsecured claims that would
be asserted in a liquidation.  *See* Darr Report 198; Updated Betro Report Ex. 1.0.

77-79; C&J Post-Trial Memo. ¶ 1, Ex. A. As of January 31, 2021, the updated amounts for those

categories, as compared to Exhibit F to the Darr Report, were that: (i) unencumbered cash

decreased $684,575 to $4,833,904; (ii) encumbered cash increased $292,149 to $6,508,093; and

(iii) the Chapter 11 administrative expenses decreased $187,147 to $902,853. *See id*. Based upon

these changes to Mr. Darr's liquidation analysis, the updated opinion of Mr. Darr as to the

proceeds available in a hypothetical liquidation is $35,658,904, which, after applying updated

accrued Chapter 11 costs of $902,853 and Chapter 7 costs of $5,592,803, would result in a

dividend of 96.89%[13] to Class 6 creditors using an unsecured claim amount of $30.1 million.

In the C&J Post-Trial Memorandum, C&J confirmed they did not contest the updated

numbers for the Debtor's unencumbered cash and Chapter 11 administrative expenses as of

January 31, 2021.  C&J Post-Trial Memo. ¶ 1, Ex. A. C&J noted two changes needed to be made

to the Betro Report liquidation analysis to facilitate a comparison with Mr. Darr's updated

liquidation analysis taking into account the additional modifications through January 31, 2021.

*See id*. at ¶ 3.

As previously noted, Mr. Blumenthal estimated that a hypothetical liquidation as of

June 30, 2020 would generate approximately $45 million in cash available for distribution to

Class 6 creditors, resulting in a 100% dividend using an unsecured claim amount of

approximately $33 million, which included pendency interest at the judgment rate of 12% on

C&J's claims.  Updated Betro Report Ex. 1.0. Mr. Blumenthal's liquidation analysis assumes

that certain refinancings for the Cobble Hill Apartments, Kings Lynne Apartments, and Colonel

Lovell's Gate Apartments have not occurred. Therefore, his liquidation analysis set forth in the

---

[13] While there was an increased amount of encumbered cash noted as of January 31, 2021, it was not
taken into account with respect to Mr. Darr's updated Chapter 7 proceeds figure and there was no change
regarding the "liens on cash" line item in Mr. Darr's liquidation analysis on Exhibit F to his expert report.
*See* Debtor's Post-Trial Memo. ¶¶ 77-79; Darr Report 198.

Updated Betro Report Exhibit 1.0 includes no amount of proceeds from those refinancings, but the "embedded values" for the Debtor's interests in those entities are pre-refinancing amounts. C&J Post-Trial Memo. ¶ 3. "To allow an apples to apples comparison to the latest liquidation analysis in the Darr Report[,]" which includes changes in the net asset value of the Cobble Hill, Kings Lynne, and Colonel Lovell's Gate properties to account for the completed and anticipated refinancings of these properties, C&J assert that the amount of unencumbered cash distributed to the Debtor from Cobble Hill financing, totaling $1,242,953 as reflected in Exhibit 8.0.1 of the Betro Report, should be subtracted from the updated unencumbered cash number of $4,833,905, leaving $3,590,952 to replace the unencumbered cash figure of $6,267,000 in the Updated Betro Report Exhibit 1.0. *See id*.; *see also* Updated Betro Report Ex. 1.0; Darr Report 198. To account for those refinancings and the changes in net asset value of entities owning regarding the Cobble Hill, Kings Lynne, and Colonel Lovell's Gate properties, Mr. Blumenthal testified that the cash available for distribution should be adjusted by adding $1.7 million to the "Cash Available for Distributions" in the Updated Betro Report Exhibit 1.0.  Trial Tr. (Day 5 (Blumenthal)), 47:8–49:24.

## II.    <u>VALUATION FINDINGS</u>

I have considered the qualifications, experience, and testimony of each of the experts and have evaluated the hypothetical orderly liquidation value of each asset reflected in the expert reports and the projected expenses associated with the hypothetical liquidations, as updated, and find, for the reasons discussed below, that the Debtor has not demonstrated that Class 6 creditors would not be paid in full if the Debtor's assets were liquidated under Chapter 7 as of the effective date of the proposed Plan.  As such, the Plan does not satisfy the "best interest of creditors" test under § 1129(a)(7) because it does not provide for the payment pendency interest

on account of allowed Class 6 claims, as discussed further in the Best Interests and Fair and Equitable Decision.

As stated above, each of the experts relied on certain assumptions and assessments of appropriate discounts in reaching their respective opinions. I have considered those assumptions and assessments in reaching applicable orderly liquidation values and the resulting proceeds available for distribution to Class 6 creditors.

As will be discussed in relation to specific asset groups below, I find that the DLOC and DLOM employed by Mr. Darr more appropriately gives weight to relevant factors in assessing the discounts to be applied in valuing the Debtor's complex assets, but, with respect to each asset group, I also find that discounts lower than those utilized by Mr. Darr should be applied, resulting in increased values. Because the expert reports of Messrs. Darr and Blumenthal were prepared as of November 30, 2020 and June 30, 2020, respectively, with certain updates through supplements, stipulations, and testimony, I have accepted as a starting point the updated November 30, 2020, orderly liquidation valuation data of Mr. Darr in assessing the hypothetical liquidation value of the Debtor's assets as of an assumed effective date of the Plan. *See* Darr Report 177–198.

When relevant, I will reference Exhibit E, the updated exhibits regarding orderly liquidation value, and Exhibit F, the updated liquidation analysis, to the Darr Report, as further modified with respect to Chapter 11 costs and available cash as of January 31, 2021, to illustrate and explain my analysis and findings. *See id.*; C&J Post-Trial Memo. ¶ 1, Ex. A. While my conclusions can be applied to other assets, and I would find that Mr. Darr's valuations should similarly be adjusted upward for assets within such other asset groups, focusing on the assets discussed below adequately demonstrates that the Debtor is not liquidation insolvent for

12

purposes of the "best interests" test under § 1129(a)(7)(A)(ii). As such, I do not specifically need

to analyze all assets within all categories, which would only serve to increase the hypothetical

liquidation solvency of the Debtor.

A.    **CMJ Entities Interests**

The Debtor possesses valuable interests in certain entities that own affordable and

mixed-income housing developments identified in the Darr Report as "CMJ Portfolio" in Exhibit

6.0(a)-(c) of Exhibit E and "CMJ Entities Interest" on Exhibit F.[14]  Darr Report 181–83, 198.

Messrs. Darr and Blumenthal each testified regarding the established considerations for

discounting the value of minority interests in assets and, in the case of Mr. Darr, the studies or

reports that he relied on in determining an appropriate DLOC.  *See, e.g.*, Blumenthal Aff. ¶¶ 38,

53; Betro Report 10; Trial Tr. (Day 5 (Blumenthal)), 23:5–26:22; 72:7–13; Darr Report 21–24;

Trial Tr. (Day 2 (Darr)), 125:17–128:18; Trial Tr. (Day 3 (Darr)), 64:15–25, 66:15–12. Each

expert referenced the terms of controlling partnership agreements and the 1987 Agreement, by

which Messrs. Corcoran, Mullins, and Jennison agreed to certain minority protections for

interests in entities included in this category of assets, including the right to board representation,

unanimous consent requirements for any new venture and any "capital event," establishment of

management responsibilities and charges, agreement that each party shall "enjoy all of the

economic benefits of the [entities] pro rata, in accordance with their present stock ownership,"

and the requirement that all "net income" of the entities be distributed quarterly.  1987

---

[14] Mr. Mullins began developing certain of these properties with C&J in the 1970's as CMJ. *See* Trial Tr. (Day 3 (Mullins)), 134:16–25. In March 1987, the parties entered into an agreement (the "1987 Agreement") establishing the terms of their continued relationship in CMJ and the related operation of the business interests in which they held percentage ownership interests, as they developed other projects independently of each other. 1987 Agreement, Trial Ex. 34. There have been a number of disputes between the parties related to the 1987 Agreement. *See* Trial Tr. (Day 3 (Mullins)), 135:20–23.

Agreement 5–9; Trial Tr. (Day 2 (Darr)), 129:24–130:5 Trial Tr. (Day 5 (Blumenthal)), 24:16–

25:16; 72:7–19.  The 1987 Agreement has been the subject of extensive litigation over the years,

the partial history of which is recited in a 2015 opinion of the Suffolk Superior Court, admitted

in evidence as Trial Ex. 35.  *See Corcoran v. Mullins*, No. 2014-01764-MHK, slip op. at 1–4

(Mass. Super. Ct. June 25, 2015); *see also Mullins v. Corcoran*, 124 N.E.3d (Mass. App. Ct.

2019), *review denied*, 127 N.E.3d 266 (Mass. 2019), *cert. denied*, 140 S. Ct. 905 (2020).[15] In the

Superior Court opinion, the court granted summary judgment in a declaratory judgment action

and held, among other things, that the 1987 Agreement did not constitute a personal services

agreement and did not create a general partnership such that its benefits and protections would

inure to successors and permitted assigns, describing the agreement as "best [being] viewed as a

manner of master shareholders' agreement." *Corcoran v. Mullins*, No. 2014-01764-MHK, slip

op. at 8. The parties disagree as to the application of that decision on possible transfers in a

hypothetical liquidation.

Mr. Darr stated in his report that he disregarded the terms of the 1987 Agreement for the

purpose of his valuation analysis because the terms of that agreement "may not apply" to a new

owner.  Darr Report 24; *see also* Trial Tr. (Day 2 (Darr)), 129:20–130:5; Trial Tr. (Day 3

(Darr)), 60:23–61:6. Mr. Darr concluded that DLOCs of 10% to 20% were appropriate

depending on the percentage ownership the Debtor possessed in each entity as reflected in

Exhibit 6.0(b) of Exhibit E to the Darr Report, most often applying a 15% DLOC.  *See* Darr

---

[15] Further history between the parties is detailed in a transcript of the oral findings and rulings entered by
the Suffolk Superior Court on June 14, 2018 in Civil Action No. 1484-CV-02302-KWS and is attached as
an exhibit to the Memorandum in Support of Motion of Creditors Joseph E. Corcoran And Gary A.
Jennison For Judgment on the Pleadings on Count II of the Complaint (Adv. Pro. No. 20-01045, Dkt. No.
22) filed in connection with the nondischargeability adversary proceeding commented by C&J in this
case. At the Trial, I indicated that I would take judicial notice of the 2018 decision.  Trial Tr. (Day 2),
99:11–14.

Report 24, Ex. 6.0(b) at 182. Conversely, Mr. Blumenthal was instructed by counsel to C&J to assume that the parties' rights under the 1987 Agreement would inure to the benefit of a purchaser of the Debtor's interests in the CMJ Entities, as well as CMJ, Inc. and CMJ Management. *See* Blumenthal Aff. ¶ 39 n.3; Trial Tr. (Day 5 (Blumenthal)), 23:25–24:5, 73:15–19, 82:11–14; Betro Report 3, 10. In Mr. Blumenthal's opinion, the 1987 Agreement was the prevailing factor minimizing the risks associated with minority ownership in these entities that supported application of a DLOC of only 5%. *See* Betro Report 9–10; Blumenthal Aff. ¶¶ 39–42; Trial Tr. (Day 5 (Blumenthal)), 25:24–26:2, 72:7–10, 73:9–19. Mr. Blumenthal opined that the 1987 Agreement, in addition to the established practice of the CMJ entities to regularly distribute operating profits and the proceeds of refinancing, should reduce risks normally associated with minority ownership. *See* Betro Report 10; Blumenthal Aff. ¶¶ 39, 43 Trial Tr. (Day 5 (Blumenthal)), 24:16–26:2, 158:5–13, 159:15–24.

After considering the factors relied on by the experts in determining applicable DLOC for these assets, I conclude that, while the DLOC applied by Mr. Darr appropriately gives more weight to the risks associated with ownership of these minority interests, Mr. Darr's DLOC should be adjusted downward by 3% – 6%, in most cases. First, while there may be a dispute over the applicability of the 1987 Agreement and the 2015 decision of the Suffolk Superior Court, a hypothetical purchaser of these interests in affordable housing developments will likely be sophisticated and ascribe some value to the rights and protections potentially afforded by the 1987 Agreement. When combined with the long history of regular distributions of operating income and proceeds from refinancings and the sophistication and experience of the parties controlling these entities, value concerns because of lack of control should be mitigated. As

such, these mitigating effects should not be disregarded, which dictates a downward adjustment

of the DLOC applied by Mr. Darr.

The DLOC of 5% suggested by Mr. Blumenthal understates the risks that may be

perceived by potential purchasers.  Given the litigious history of the parties to the 1987

Agreement, potential open issues regarding its enforceability by transferees, and stock transfer

restrictions that may be asserted, a prudent buyer would likely discount the value of those

interests more than 5%.  On cross examination, Mr. Blumenthal forthrightly indicated that he

could not opine how certain provisions of the 1987 Agreement would be enforced if the Debtor's

interests were transferred to multiple parties.  Trial Tr. (Day 5 (Blumenthal)), 76:10–77:6,

77:21–79:10. Because he was instructed to assume that that agreement could be enforced by any

transferee, these and similar issues and risks were not reflected in his DLOC, which is, therefore,

understated. *See, e.g.*, Trial Tr. (Day 5 (Blumenthal)), 23:25–24:3; 73:15–19, 80:6–10;

Blumenthal Aff. ¶ 39 n.3.

Turning now to the competing opinions regarding an appropriate DLOM to be applied to

the ownership interests in the CMJ Entities category where there is no public market for those

interests, the experts considered a number of diverse studies as reflected in their reports.  *See,*

*e.g.,* Betro Report 11–12; Blumenthal Aff. ¶¶ 48–54; Trial Tr. (Day 5 (Blumenthal)), 26:22–

29:12; Darr Report 24–30; Trial Tr. (Day 2 (Darr)), 130:12–131:16; Trial Tr. (Day 3 (Darr)),

67:4–71:24. Those studies indicated a very wide range of discounts suggested by sales of

interests that (i) had SEC Rule 144 restrictions on transfer, (ii) were issued pursuant to private

placements with and without registration rights, (iii) were issued for REITS that were not listed

on an exchange; or (iv) were issued before an initial public offering.  *See id*. Mr. Darr also

considered studies that analyzed the higher rate of return necessary to "compensate" investors

who accept the risk of non-marketability associated with private investments, restricted securities

investment, and longer-term government bond investments. *See* Darr Report 25–29; Trial Tr.

(Day 2 (Darr)), 130:16–131:8; Trial Tr. (Day 3 (Darr)), 67:7–9, 71:16–24. Each expert testified

as to why the respective studies the expert considered were relevant and the factors contemplated

in determining a DLOM to be applied in valuing assets in this category.  As set out by Mr. Darr,

these factors include entity size, quality of management, diversification, financial performance,

leverage, access to information, pool of potential buyers, and the size of the ownership interest.

*See* Darr Report 30. Mr. Darr applied a DLOM of 25% to all of the CMJ Entities Interests. *See*

*id*. at 30, 182; Trial Tr. (Day 2 (Darr)), 131:17–22. Mr. Blumenthal applied a DLOM of 15% in

valuing those same interests.  *See* Betro Report 12; Ex. 3.0 to Betro Report, Joseph R. Mullins

Co-Owned CMJ Properties (Non-CMJ Inc Ownership), Trial Ex. 52.

Once again, after considering the relevance of the various studies and each of the factors

associated with discounting for a lack of marketability, Mr. Darr's DLOM seems more reflective

of a likely discount, but should be reduced further after weighing the factors identified by Mr.

Blumenthal and cited by Mr. Darr.  *See* Betro Report 12–13. The Debtor's interests are

substantial interests in well-established affordable housing developments.  *See id*. at 13.  Mr.

Darr recognized in his testimony that where leases are subsidized or guaranteed by government

programs there is value and a hedge against turns in the economy, particularly because the lease

rates are periodically "marked to market," where rents are adjusted to reflect market rents, and

demand is constant.  *See* Trial Tr. (Day 3 (Darr)), 44:20–45:11, 47:19–48:14, 73:20–74:8, 74:11–

14; *see also* Trial Tr. (Day 2 (Lessin)), 64:2–12, 66:7–11 (discussing "marked to market"

concept).  The combined DLOC and DLOM cited by Mr. Blumenthal suggested by certain

studies and the unique quality of these assets attributed to his determination of a 15% DLOM for

these assets. *See* Betro Report 12–13; Trial Tr. (Day 5 (Blumenthal)), 28:25–29:16. Taking all

of these factors into account, along with my experience, and the record in this case, I find that a

DLOM of 19% – 22% would be appropriate for valuing assets in this category.

Mr. Blumenthal also included in his report certain valuation adjustment alternatives

because Messrs. Corcoran and Jennison may have expressed an interest in acquiring these and

other related interests at a stated price. *See* Betro Report 15, Scenario No. 2, Alternative

Liquidation Treatment of Mullins' Interests in CMJ Entities. I have not considered that

expression of interest in valuing these assets, but rather I have weighed the interest and effect of

these bidders in assessing the pool of potential buyers in a hypothetical Chapter 7 sale. I have

considered that these interests would be likely to attract bids from sophisticated investors with

knowledge of affordable housing assets. As with many sales in bankruptcy cases of fractional

interests in assets, the other owners are also likely bidders. As such, it would be reasonable to

conclude that there will be an active market for these investment assets and that competitive

bidding could be expected, including from the other current interest holders who have an

intimate knowledge of the assets and an incentive to avoid having the uncertainty of an unknown

purchaser obtain an interest.

After considering the foregoing analysis, I find that reducing the DLOC and DLOM used

by Mr. Darr each by 5% is appropriate. Applying a DLOC reduced by 5% on a line-item basis

and a DLOM of 20% to the CMJ Entity Interests on Exhibit 6.0(b) of Exhibit E to the Darr

Report results in an <u>increase</u> in the orderly liquidation value of these interests (after discounts) of

$639,089.

B.    **CMJ/CMJ Management Stock**

The "CMJ/CMJ Management Stock" assets included on Exhibit 7.0(a) of Exhibit E to the

Darr Report consist of a 20% interest in CMJ, Inc., which possesses a variety of primarily small

percentage interests in various entities owning affordable housing developments, and a 33%

interest in CMJ Management, which I understand provides property management services to

entities in which the Debtor has an interest through his CMJ Entities Interests and his interest in

CMJ, Inc.  *See* Darr Report 184; *see also* Betro Report, Ex. 4.0. The Debtor's interests include

encumbered and unencumbered shares as reflected on Exhibit 7.0(b) of Exhibit E to the Darr

Report.[16]  *See* Darr Report at 185. Mr. Darr applied a DLOC of 10% – 15% to these interests,

---

[16] On April 24, 2019, Mr. Mullins purchased shares of CMJ, Inc. and CMJ Management from his children
as follows:

> 1,550 nonvoting shares of CMJ, Inc. ("Inc") and 90 nonvoting shares of CMJ
> Management, Inc. ("Management") in exchange for two secured promissory notes in
> the aggregate amount of $25,522,314, which shares had previously been gifted to his
> children in 2012 and 2013; (ii) 10 voting shares of Management in exchange for two
> unsecured promissory notes in the aggregate amount of $1,172,707.40, which shares
> had previously been sold to his children on June 30, 2018 for cash in the amount of
> $58,335.38 and two promissory note[s] in the aggregate amount of $1,108,372.04; and
> (iii) 250 voting shares and 700 nonvoting shares of Inc in exchange for two unsecured
> promissory notes in the aggregate amount of $9,207,001, which shares had previously
> been sold to his children on June 30, 2018 for cash in the amount of $520,850.80 and
> two promissory notes in the aggregate amount of $9,896,165.20.

Note to Statement of Financial Affairs Question 18, Trial Ex. 1, at 50. The Debtor repurchased the gifted
shares from his children to protect the shares from potentially being repurchased by C&J at a discounted
value if the Debtor filed for bankruptcy due to the stock restriction agreement between the parties. Trial
Tr. (Day 1 (Lessin)), 111:4–21; Trial Tr. (Day 2 (Lessin)), 16:10–20, 17:4–8; Trial Tr. (Day 3 (Mullins)),
205:3–6.

The reciprocal unsecured notes between Mr. Mullins and the children related to the CMJ Inc. unsecured
shares are roughly equivalent. Trial Tr. (Day 2 (Lessin)), 30:9–12, 46:6–17.  With respect to the secured
shares, once transferred to Mr. Mullins, the only rights that the children had in any distributions that were
made on account of the secured shares was that the proceeds could provide extra security for the
repayment of Mr. Mullins' obligation to the children. Pledge Agreement; Trial Tr. (Day 2 (Lessin)),
18:19–19:1; Trial Tr. (Day 3 (Mullins)), 210:16–18, 210:25–211:7. On Exhibit 7.0(b) of Exhibit E to the
Darr Report, Mr. Darr ascribed a net value of the secured "gift shares" of zero. Darr Report 185.
Assuming the unsecured notes between Mr. Mullins and his children related to the CMJ Inc. are

depending on the characteristics of the interest, and a DLOM of 25%. *See id*. at 184–85. Mr.

Blumenthal applied a DLOC of 5% to these interests and a DLOM of 15%. For the reasons

stated with respect to valuation of the CMJ Entities Interests above, I find that a DLOC of 9% –

12% and a DLOM of 19% – 22% would be appropriate for valuing the CMJ/CMJ Management

Stock assets. A potential buyer at a hypothetical liquidation sale would likely discount the

perceived value of these assets in the same manner as the CMJ Entities Interests. The possible

inclination of a potential purchaser (including the other current interest holders) to discount the

value by a greater amount would likely be outweighed by a desire to obtain interests in the

management company and a greater stake in the overall CMJ portfolio.

Since each expert has treated certain of these interests to be fully encumbered, I have

only considered the value of the unencumbered interests reflected on Exhibit 7.0(b) of Exhibit E

and Exhibit F of the Darr Report. Darr Report 185, 198. Upon consideration of the expert

opinions and appropriate discounts to be applied in valuing the CMJ/CMJ Management Stock, I

conclude that a reduction of each of the DLOC and DLOM applied by Mr. Darr of 5% is

required. Applying a DLOC reduced by 5% on a line-item basis and a DLOM of 20%, rather

---

equivalent, Mr. Mullins' remaining liability after payment of Class 6 creditors is the liability to on the secured notes in the amount of $25,522,316. *See* Trial Tr. (Day 2 (Lessin)), 30:9–12, 46:6–17.

The children are not typical disinterested secured creditors, because they also have an interest in assisting their father in maintaining his interests in his various assets. Ms. Lessin, who has been involved in the estate planning of Mr. Mullins, confirmed that the Debtor's intent "has been and is to transfer his interests and his various real estate entities to his children either during his lifetime or upon his death" and to "the extent that Mr. Mullins is able to avoid a liquidation of his real estate interests through a Chapter 7 liquidation and maintain those, those are at some point going to go to his children." Trial Tr. (Day 2 (Lessin)), at 12:10–22. Mr. Mullins views repayment of the $25 million to his children as estate planning. Trial Tr. (Day 3 (Mullins)), 148:25–149:6.

than 25%, to the unencumbered interests in CMJ, Inc. and CMJ Management, Inc. results in an

<u>increase</u> in the orderly liquidation value of these interests (after discounts) of $576,519.

**C.      Loans Due To Debtor**

The "JRM Loans" category of assets includes loans carried on the books and records of

certain entities (and one individual) as "due to" the Debtor as reflected on Exhibit 8.0(a)–(h) of

Exhibit E of the Darr Report and Exhibit F to that report on account of operating deficit

advances, restructuring loans, and other advances. *See* Darr Report 188–96, 198; *see also* Trial

Tr. (Day 2 (Lessin)), 27:20–23, 28:9–17, 29:8–10, 17–23. Evidence was presented at trial that

most of these loan receivables are unsecured, are not evidenced by promissory notes or other

loan documentation, and have no maturity date or repayment terms. *See, e.g.*, Trial Tr. (Day 2

(Darr)), 147:5–19; Trial Tr. (Day 5 (Blumenthal)), 135:12–22; Trial Tr. (Day 1 (Lessin)),

148:11–14, 148:22–149:15, 158:22–161:5. Further, no interest or principal payments have been

made with respect to many of the loans. Trial Tr. (Day 2 (Lessin)), 29:3–4. Each expert

significantly discounted the value of these loans in their respective reports, Mr. Darr by 75% and

Mr. Blumenthal by 50%. Darr Report 188–96, 198; Trial Tr. (Day 2 (Darr)), 149:8–9; Betro

Report 13–14; Trial Tr. (Day 5 (Blumenthal)), 134:11–15.

Much of the testimony and analysis regarding this asset group focused on the loans due to

the Debtor from Mass. Mills I and Mass. Mills II, two limited partnerships that own separate

phases of an established affordable housing re-development with respect to which the Debtor

controls the corporate general partner and he and his family currently own substantially all of the

limited partnership interests.  Trial Tr. (Day 2 (Lessin)), 27:20–23, 28:9–17, 29:3–4; Trial Tr.

(Day 3 (Mullins)), 197:13–17.  The Debtor's schedules and statement of financial affairs,

admitted as Trial Exhibit 1 (the "Schedules"), reflect these loans receivable, and even though

there is a variance with the Debtor's Schedules, Ms. Lessin testified that loan amounts shown in the schedules to the Darr Report are accurate and reflect the amounts carried on the books and records of the two Mass. Mills entities aggregating to $12,487,157.  Trial Tr. (Day 2 (Lessin)), 94:4–18.

Each expert considered whether (i) the entities owing money to the Debtor had sufficient liquid assets to pay the loans, (ii) there were restrictions on the ability to make payment, and (iii) assets exceeded liabilities (including these loans) on a balance sheet basis.  Trial Tr. (Day 5 (Blumenthal)), 33:12–34:8; Betro Report, Ex. 5.1;  Trial Tr. (Day 3 (Darr)), 34:4:13. Mr. Darr states in his report that in his view "these loans are analogous to equity" so that application of discounts relevant to valuing equity are appropriate. Darr Report 37; Trial Tr. (Day 3 (Darr)), 12:19–13:9, 17:25–18:3.  Mr. Blumenthal agreed in this approach.  Neither expert applied a DLOC to these assets, and each applied a substantial DLOM, only disagreeing as to the percentage DLOM to be applied, as set out above.  Mr. Blumenthal assumed that a hypothetical Chapter 7 trustee would sell assets in the same manner as assumed by Mr. Darr for his baseline valuation, but offered an alternative that Mr. Blumenthal believes would increase the value of the Mass. Mills loan assets.  Blumenthal Aff.  ¶ 16. Mr. Blumenthal suggests that a hypothetical Chapter 7 trustee could cause the sale of the assets of each of the Mass. Mills partnerships, resulting in sufficient proceeds to pay the Mass. Mills loans in full and increase the valuation of Mr. Darr by approximately $6.5 million.  *See id.* at  ¶¶ 60 – 67; Betro Report, Ex. 9.0.

During their examinations, each expert testified whether he had considered certain relevant governance provisions of the organizational documents, the fact that none of the Mass. Mills interest holders have expressed any defense to or issue with the stated loan amounts, adoption of provisions of the governing documents authorizing certain loans by current interest

22

holders, the possibility of "equitable recharacterization" of the loans, and the applicability of

certain waterfall provisions applicable to certain equity classes, among other potentially relevant

considerations. *See, e.g.,* Trial Tr. (Day 2 (Darr)), 17:6–19, 149:8–9; Trial Tr. (Day 3 (Darr)),

40:10–42:3; Trial Tr. (Day 5 (Blumenthal)), 139:9–16.  The experts could not offer an opinion

on the legal issues associated with many of the considerations that would underlie attempting to

value the "forced sale" collection alternative involving the assets of each of the Mass. Mills

partnerships. *See, e.g.,* Trial Tr. (Day 5 (Blumenthal)), 50:17–51:5; Trial Tr. (Day 2 (Darr)),

147:20–148:22; Trial Tr. (Day 3 (Darr)), 20:23–21:7, 26:7–21, 28:11–29, 33:10–34:14, 42:7–22.

Mr. Blumenthal provided the analysis of this alternative because he was "asked to consider" an

alternative where a Chapter 7 trustee was able to cause a sale of the Mass. Mills assets.

Blumenthal Aff. ¶ 59.  He testified that, if certain assumptions that he made at the instruction of

counsel were different, the value of this alternative would be diminished. Trial Tr. (Day 5

(Blumenthal)), 148:6–14, 148:23–149:13.

      I have considered the evidence relating to Mass. Mills and the loans due to the Debtor by

those limited partnerships, including Trial Exhibits 18 – 21, and the legal arguments of counsel.

In my estimation, the "forced sale" alternative considered by Mr. Blumenthal underestimates the

difficulties and risks that would be faced by a hypothetical Chapter 7 trustee taking control of the

corporate general partner of Mass. Mills and causing that general partner to liquidate stabilized,

income-producing affordable housing assets of the respective partnerships to collect developer

loans – undoubtedly in the face of well-funded opposition and possible litigation by the children

of Mr. Mullins who control the other limited partnership interests with potential distribution

preferences and possible third-party purchasers of those interests.  While I am skeptical that the

loans would be equitably subordinated to the level of limited partnership interests given the

limited facts in the record (as opposed to subordinated to third-party creditor claims), the prospect that a Chapter 7 trustee would pursue this liquidation alternative is so small that I find that it is not a basis for valuing these assets.

The more likely liquidation scenario is that these "loans" or claims are sold to a third-party buyer that would also acquire the Debtor's interests in the Mass. Mills limited partnerships and their general partners or to the current holders of the other interests in the Mass. Mills limited partnerships. The Debtor's interests are included in the "JRM Independent Portfolio" Exhibits 5.0(a)–(c) of Exhibit E and the "Mullins Entity Interests" category in Exhibit F of the Darr Report and are estimated to have no orderly liquidation value. Darr Report 178–180, 198. Notwithstanding this, Mr. Darr utilized a combined net asset value for the Debtor's equity interests in Mass. Mills of in excess of $1 million after application of an orderly liquidation discount, but no other discounts. *See id*. at 179. There is no evidence that these developments do not have any cash flow and even Mr. Darr assumes that the Mass. Mills loans have a value in excess of $3 million. *See id*. at 188.

For purposes of analysis and illustration, I have focused my analysis on the Mass. Mills I and Mass. Mills II  loans and note that other loans in this asset category could be subject to the same type of analysis. The value of these loan assets should be significantly discounted as suggested by both experts, but Mr. Darr's DLOM of 75% overstates the risks and delay that would be considered by a potential purchaser and Mr. Blumenthal's DLOM of 50% understates those risks. I find that a DLOM in the range of 60–62% is more appropriate. Applying  a DLOM of 62% to the loans due to the Debtor from the Mass. Mills entities results in an <u>increase</u> in the orderly liquidation value of these assets (after discounts) of $1,460,998.

24

D.    **KC II Reimbursement Claim**

The KCII Reimbursement Claim "asset" consists of an anticipated claim that would arise

in favor of the Debtor's estate when a hypothetical distribution is made by the estate on account

of a $10 million proof of claim filed by the MHFA arising from a limited guaranty by the Debtor

of the obligations of KC II to MHFA under both a note and a swap agreement. *See* Proof of

Claim 10-2, Trial Ex. 10. Mr. Mullins is the 100% owner of JRM-KC II, Inc., the 1% controlling

member of KC II, and 53.81% owner of J.R. Mullins Family LP II, the 50% limited partner of

KC II. *See* Darr Report, Ex. 2.0(a)–(b) and 5.0(a)–(c), at 170–1, 178–180.

Each expert assumed that substantially all of the claim would be paid and that the estate

would have a claim for reimbursement against KC II.  Trial Tr. (Day 5 (Blumenthal)), 38:14–22;

Trial Tr. (Day 2 (Darr)), 143:12–16, 195:10–15. Because KC II is balance sheet solvent and it

owns and operates a stabilized, mixed income development that generates distributions to its

partners, Mr. Blumenthal opined that this claim would have a $10 million value to the Debtor's

hypothetical Chapter 7 estate.  Trial Tr. (Day 5 (Blumenthal)), 37:5–16.   Mr. Darr focused on a

hypothetical Chapter 7 trustee's inability to compel a payment by or liquidation of KC II and the

time that could be necessary to obtain payment of any reimbursement claim.  Trial Tr. (Day 2

(Darr)), 202:15–205:2.   Based on his experience, he testified that a Chapter 7 trustee would be

likely to compromise any reimbursement claim for $4.5 million and that a bankruptcy court

would approve that compromise as reasonable under applicable legal standards. Trial Tr. (Day 2

(Darr)), 143:17–144:8, 145:7–12.  Mr. Darr testified  that the claim for reimbursement (before

discounts) would be $9,854,000, an increase from $8,855,000 set forth in his valuation report

based on his increased distribution to unsecured creditors reflected in his updated liquidation

analysis as of the Trial. Trial Tr. (Day 2 (Darr)), 231:16–20; Darr Report 198. Based on the post-

25

Trial adjustments, Mr. Darr's estimate of the amount of the claim for reimbursement has decreased slightly to $9,689,000 because of a further revision in his distribution estimate. The experts also testified that they had been informed that KC II could generate substantial cash from a refinance in 2021, but neither could opine on a hypothetical Chapter 7 trustee's ability to force that refinancing or a lender's willingness to finance if the Debtor's equity interests in KC II and its general partner had been sold to a third party or were in the control of the Chapter 7 trustee. Trial Tr. (Day 5 (Blumenthal)), 116:16–20, 117:17–118:23; Trial Tr. (Day 2 (Darr)), 213:10–18, 225:6–15, 225:22–226:1.

I agree with Mr. Darr that this claim should not be valued at 100% because of potential delays in and issues associated with monetizing the asset. However, the hypothetical claim appears to have substantially more value that that estimated by Mr. Darr. In the hands of a sophisticated Chapter 7 Trustee, potentially coupled with the Debtor's equity interests in KC II and its general partner, I find that, within 24 months, this asset would likely generate proceeds in excess of $5.75 million in a hypothetical liquidation of the reimbursement claim. It appears that the KC II project is too valuable for its partners to act in an irrational manner – even in a hypothetical scenario – to lose the opportunity to refinance and pay this liability to retain stability and control of the project. Using $5.75 million, rather than $4.5 million, in Mr. Darr's analysis results in an <u>increase</u> in the orderly liquidation value of these assets (after discounts) of $1.25 million.

## E.   **Mullins Entities Interests**

In addition, based on the repayment of the KC II reimbursement claim, the Darr Report further understates the net proceeds available from the hypothetical sale of the Debtor's KC II interests in  JRM-KC II, Inc. and J.R. Mullins Family LP II described in the "JRM Independent

Portfolio" Exhibits 2.0(a)–(b) and 5.0(a)–(c) of Exhibit E and the "Mullins Entities Interests" category in Exhibit F of the Darr Report, which necessitates a further increase to his liquidation analysis. *See* Darr Report, Ex. 2.0(a)–(b) and 5.0(a)–(c), at 170–1, 178–180. The estate's payment of MHFA's $10 million unsecured claim on its guaranty would reduce KC II's liabilities in the amount of $32,701,689 shown in Exhibit 5.0(a) of the Darr Report by $9,689,000, using Mr. Darr's updated distribution amount for illustration purposes, but the resulting reimbursement to Mr. Mullins on his guaranty would be only $5.75 million, based on the increased valuation finding with respect to the KC II Reimbursement Claim above. As such, there would be a net reduction in KC II's liabilities of $3,939,000, and an increase in the Debtor's share of that net asset value of KC II. Trial Tr. (Day 3 (Darr)), 6:16–8:11. Given the Debtor's indirect 27.9% ownership interest in KC II, considering the $3,939,000 net reduction in light of the Darr Report's liquidation value assessments for the Debtor's KC II's interests and applying a DLOC of 5% to the J.R. Mullins Family LP II interest to which Mr. Darr applied a 10% DLOC and a 20% DLOM instead of the 25% DLOM applied by Mr. Darr to both the J.R. Mullins Family LP II and JRM-KC II, Inc. interests, there would be an increase to the net available proceeds resulting from the sale of the Debtor's KC II interest by approximately $1,063,000. At trial, Mr. Darr acknowledged that there would be an increase of orderly liquidation value of the Debtor's interests in KC II of approximately $1 million using this methodology. Tr. (Day 3 (Darr)), 8:12–21. For purposes of my analysis, I have increased the orderly liquidation value of these interests (after discounts) by $1 million.

**F.   Maine Property**

The Debtor has an interest in property located in Camden, Maine comprised of an unimproved 2.9 acre parcel of land located on Crane Island, a 5.8 acre parcel on Crane Island

27

improved by a single-family home, a .18 acre parcel on Beaucaire Avenue (boat dock and

parking area), and a .03 acre parcel on Beaucaire Avenue (parking area) (collectively, the

"Maine Property"), which the Debtor valued at $1,455,00 on his Schedules. *See* Schedule A/B 6–

8. Mr. Darr has identified the Maine Property on Exhibit F of the Darr Report as one of the

properties comprising the "JRM Real Estate" category. Darr Report 198. During the course of

the bankruptcy case, the Debtor sought to sell the Maine Property (Dkt. No. 181) (the "Sale

Motion") to a member of his family for $1.8 million and received a $2 million counteroffer for

the property (Dkt. No. 195) ("Amended Notice of Counteroffer"). *See* Sale Mot. ¶¶ 11, 17, Trial

Ex. 37; Amended Notice of Counteroffer 1, Trial Ex. 36. The Debtor ultimately determined not

to sell the property and withdrew his Sale Motion (Dkt. No. 263) ("Notice of Withdrawal"). *See*

Notice of Withdrawal 1.

In valuing the Maine Property for the purposes of the Plan's liquidation analysis, the

Debtor used $2 million as a base value and then discounted that amount by 20% on instructions

from counsel. Trial Tr. (Day 1 (Lessin)), 161:16–24. In his report, Mr. Darr used the Debtor's

value and ascribed an orderly liquidation value to the Maine Property, after discounts, of $1.6

million and, after deducting costs of sale, of $1.44 million. Darr Report 198. Mr. Blumenthal

asserts the Maine Property has a liquidation value of $2 million, reduced to $1.8 million after

taking into account the costs of sale. Updated Betro Report Ex. 1.0. Mr. Blumenthal testified that

he departed from Mr. Darr's starting orderly liquidation value because of the bid that had been

submitted. Trial Tr. (Day 5 (Blumenthal)), 44:8–17.

Taking into consideration the counteroffer, the passage of time since the offer was

submitted, and various discounts taken by Messrs. Darr and Blumenthal, I find that the orderly

liquidation value (after discounts) of the Maine Property is at least $1.71 million ($1.9 million

less a10% sale discount). This results in an <u>increase</u> in the orderly liquidation value of this asset (after discounts) reflected in the Darr Report of $260,000. *See* Darr Report 198.

### III.          CHAPTER 7 ADMINISTRATIVE COSTS FINDINGS

In addition to the findings I have made above regarding the valuation of certain asset categories,[17] I must also consider the Chapter 7 administrative costs in a hypothetical liquidation. In their reports, Messrs. Blumenthal and Darr agree on most projected Chapter 7 costs, with the exception of legal fees that would be incurred by a hypothetical Chapter 7 trustee in connection with a liquidation of the Debtor's assets. Mr. Darr testified that, in his experience, projecting legal fees of 10% of unencumbered orderly liquidation value (calculated to be legal fees of approximately $4 million) was reasonable after reconsidering his initial 7% allocation to projected legal fees. *See* Trial Tr. (Day 2 (Darr)), 153:1–8; Trial Tr. (Day 3 (Darr)), 90:11–91:1, 94:10–18, 96:13–15. He testified that often administrative costs for a Chapter 7 trustee exceeded that percentage and are "generally . . . in the neighborhood of ten percent or more." *See* Trial Tr. (Day 3 (Darr)), 108:14–22. Having taken judicial notice of a report compiled and published by the United States Trustee Program as to fees incurred in Chapter 7 asset cases for "oversight and statistical reporting purposes" and considering the report as a snapshot of data contained in final reports filed in asset cases nationwide, in comparing the numbers to my general experience in approving fees in Chapter 7 cases, I determine that Mr. Darr's conclusions regarding Chapter 7 trustee fees appeared to be consistent with the range of Chapter 7 legal fee expenses reflected in the report. *See* U.S. Trustee Program, Chapter 7 Trustee Final Reports, Chapter 7 Asset Cases

---

[17] Because the adjusted values determined above sufficiently exceed the unsecured claims in a hypothetical liquidation less Chapter 11 administrative expenses and projected hypothetical Chapter 7 expenses discussed in Part III and IV *infra*, it is not necessary that I make further findings on values of specific assets after applying adjusted discounts.

Closed, Calendar Year 2019, https://www.justice.gov/ust/bankruptcy-data-statistics/chapter-7-trustee-final-reports (last updated October 29, 2020); *see also* Darr Report 198; Trial Tr. (Day 2 (Darr)), 153:1–10, 156:3–6.

Mr. Darr did not engage in any specific analysis of the services that would be required to be performed in connection with the hypothetical liquidation of the Debtor's assets, rather he relied on his substantial general experience in liquidation matters in formulating his opinion. Trial Tr. (Day 2 (Darr)), 153:1–10. Mr. Darr had no specific experience relating to liquidation sales of fractional interests in real estate partnerships or related-party loans. Trial Tr. (Day 2 (Darr)), 117:2–120:4; Trial Tr. (Day 3 (Darr)), 42:23–43:5, 66:18–67:3. In his testimony, Mr. Darr acknowledged that his legal fee estimate in connection with his original report was $2.3 million (based on 7% of unencumbered proceeds) and that his original report contemplated the sale of negative value assets, which would have entailed more legal work that contemplated in his final report. Trial Tr. (Day 3 (Darr)), 93:15–20, 94:10–18, 96:2–6, 96:16–20, 97:6–23, 98:1–4. Because Mr. Darr's estimate of legal fees is based on proceeds generated from hypothetical sales, his estimate of those fees increased significantly as his opinion of values increased in his supplements, but the scope of legal services to be rendered by counsel on behalf of a Chapter 7 trustee were not contemplated to be any different in liquidating the assets. *See id.* at 92:2–23.

Mr. Blumenthal relied on the opinion provided in the Lassman Affidavit to estimate legal fees. Trial Tr. (Day 5 (Blumenthal)), 46:15–17. Mr. Lassman, who is an experienced Chapter 7 trustee and bankruptcy practitioner, testified at the Trial that in his opinion a Chapter 7 trustee would incur legal fees of $1.7 million in connection with the hypothetical liquidation of the Debtor's assets. Trial Tr. (Day 4 (Lassman)), 24:7–13, 36:17–21. Mr. Lassman acknowledged that he did not have direct experience with cases of this size or that involved fractional interests

in real estate partnerships or sale of related-party loans.  *Id*. at 38:22–25.  Mr. Lassman testified

that he used a "task-based" approach, reflecting what he believes a particular task would cost

based on his experience with bankruptcy court sales. Lassman Aff. ¶ 12; Trial Tr. (Day 4

(Lassman)), 36:22–37:4. While Mr. Lassman took this task-based approach, he neither

specifically considered the services that would  need to be performed to administer and liquidate

each asset nor did he estimate the time required for such services at an assumed average rate.

Trial Tr. (Day 4 (Lassman)), 36:22–37:4, 37:22–38:15, 40:2–7, 43:21–24. Rather, he estimated

the costs of accomplishing tasks based on his experience. *See id*. at 13:20–14:9; 37:22–38:15.

For example, for most hypothetical sales of individual fractional partnership interests with

substantial value, Mr. Lassman assumed that $50,000 in fees would be incurred. *See* Lassman

Aff. ¶ 13. He also assumed the same amount of fees for the sale of substantial loans "due to" the

Debtor. *See id*. at ¶ 13(d). In his affidavit, Mr. Lassman details the tasks that he evaluated and the

associated estimated legal fees, including legal fees in connection with administration of the

hypothetical Chapter 7 estate.  *See id*. at ¶¶ 12, 15–16.

After considering the record in this case, the testimony of these experts, and my

experience in assessing Chapter 7 trustee counsel fees, I find that legal fees in the range of $2.75

million to $3 million could reasonably be expected in connection with the hypothetical

liquidation of the Debtor's assets.[18]   For purposes of analysis and illustration, if I assume that

legal fees associated with the hypothetical liquidation would be $3 million, anticipated Chapter 7

costs would <u>decrease</u> by $1,032,925.

---

[18] I note that, while each expert estimated costs of sale of 10% for each asset, that amount is likely high in
relation to the Mass. Mills loan dispositions and could offset legal costs associated with disposition of
assets.

In determining the total estimated Chapter 7 costs, which, in addition to compensation for counsel to the Chapter 7 trustee, includes the Chapter 7 trustee's statutory 3% commission, bonding, and other miscellaneous wind-down costs, Mr. Darr's estimated hypothetical Chapter 7 trustee commission should be adjusted upward for purposes of this analysis to reflect the increased commission calculated on the adjusted proceeds available for distribution I have determined by adding 3% of the increase, $155,598, to Mr. Darr's estimated total Chapter 7 expenses to reflect the increased commission.  See Darr Report at 198. Mr. Darr estimated hypothetical Chapter 7 expenses totaling $5,592,803 and when those expenses are decreased by $1,032,925 and increased by $155,598, the adjusted amount is $4,715,476, resulting in proceeds of a hypothetical liquidation of $35,227,181.

## IV.    CONCLUSION

Using the "proceeds" in Exhibit F of the Darr Report reflecting his orderly liquidation value (after discounts) as a base line, making the adjustments to the values described above, and taking into account the updated amount of the unencumbered cash totaling $4,833,904 agreed to by the parties, the "proceeds" of the hypothetical liquidation determined by Mr. Darr increase by $5,186,606, from $35,658,904 to $40,845,510. Deducting the updated Chapter 11 administrative expense claim estimates stipulated to by the parties ($902,853) and the anticipated Chapter 7 expenses I have determined ($4,715,476), I find that at least $35,227,181 would be available for distribution to holders of Class 6 claims in a hypothetical liquidation.  The parties have stipulated that Class 6 claims aggregate $20,112,052 as of the petition date. *See* Pendency Interest Stipulation, Exs. 1 and 2.  Including the MHFA guaranty claim of $10 million for purposes of this determination, general unsecured claims in a hypothetical liquidation would be $30,112,052. As such, holders of general unsecured claims would be paid in full in a hypothetical liquidation

and the holders of such claims would also be entitled to be paid postpetition interest pursuant to

§ 726(a)(5).[19]  Because the Debtor is liquidation solvent, and because the Plan does not provide

Class 6 creditors with at least the amount they would receive in a hypothetical liquidation, the

Debtor has not met his burden to show that the Plan satisfies the "best interest of creditors" test

under § 1129(a)(7).

By the Court,

Dated: July 13, 2021

Christopher J. Panos
United States Bankruptcy Judge

---

[19] The parties have stipulated that this amount would be $829,250 if the "legal rate" is the federal judgment rate and approximately $3,691,396 if the "legal rate" is determined to be the state court judgment rate of 12% with respect to the C&J claims as advocated by C&J. *See* Pendency Interest Stipulation, Exs. 1 and 2 (amounts as of Feb. 1, 2021).