## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| JOSEPH R. MULLINS, | ) | Case No. 19-11574-CJP |
| | ) | |
| Debtor | ) | |
| | ) | |

**MEMORANDUM OF DECISION REGARDING WHETHER THE DEBTOR HAS SATISFIED THE "BEST INTERESTS" AND "FAIR AND EQUITABLE" REQUIREMENTS OF 11 U.S.C. § 1129 TO OBTAIN CONFIRMATION OF SECOND AMENDED PLAN OF REORGANIZATION, AS MODIFIED, OVER THE OBJECTION OF AN IMPAIRED CLASS OF GENERAL UNSECURED CREDITORS**

Before the Court is the *Second Amended Plan of Reorganization of Joseph R. Mullins, as Modified* (Dkt. No. 333) (the "Plan") proposed by Joseph R. Mullins ("Mr. Mullins" or the "Debtor") and the objection to confirmation of the Plan (Dkt. No. 478) ("Objection") filed by Michael Corcoran, as personal representative of the estate of the late Joseph E. Corcoran ("Mr. Corcoran"), and Gary A. Jennison ("Mr. Jennison," together with Mr. Corcoran, "C&J"). After a five-day evidentiary hearing (the "Trial") and consideration of the Plan, the Objection, the Debtor's memorandum of law in support of the Plan (Dkt. No. 479) (the "Memorandum of Law"), C&J's reply to the Memorandum of Law (Dkt. No. 506) (the "Reply"), the Joint Prehearing Report (Dkt. No. 483) containing a list of agreed facts (the "Agreed Facts"), the Debtor's *Proposed Findings of Fact and Conclusions of Law* (Dkt. No. 544) (the "Debtor's Post-Trial Memorandum"), *C&J Creditors' Post-Trial Memorandum and Proposed Findings of Fact and Rulings of Law In Support of Entry of an Order Denying Plan Confirmation for Failure to Satisfy 11 U.S.C. § 1129(b) (Fair and Equitable Requirements) and 11 U.S.C. § 1129(a)(7) (Best*

*Interests of Creditors Test)* (Dkt. No. 545) (the "C&J Post-Trial Memorandum"), the arguments

made by counsel, and the entire record in this case, I conclude, for the reasons below, that the

Debtor has not met his burden with respect to certain requirements of 11 U.S.C. § 1129[1] to

obtain confirmation of the Plan without further amendment. Pursuant to Fed. R. Civ. P. 52, made

applicable by Fed. R. Bankr. P. 9014(c) and 7052, this decision constitutes my findings of fact

and rulings of law as to whether the Plan satisfies the "best interests" test of § 1129(a)(7)(A)(ii)

and is "fair and equitable" as to the rejecting class of general unsecured creditors under §

1129(b).[2]

## I.      **JURISDICTION**

This Court has jurisdiction over confirmation of a Chapter 11 plan, which arises under

the Bankruptcy Code, pursuant to 28 U.S.C. §§ 157(a) and 1334 and Rule 201 of the Local Rules

of the United States District Court for the District of Massachusetts. Confirmation is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L). Accordingly, I have authority to

enter a final order in this matter.

## II.     **STANDARD AND BURDEN**

Section 1129 of the Bankruptcy Code sets forth the requirements to confirm a Chapter 11

plan. Where an impaired class has voted to reject a plan, as is the case here, a plan may be

confirmed only if it (a) satisfies every applicable provision of § 1129(a), other than subsection

(a)(8) (requiring that each class either has accepted the plan or is unimpaired), and (b) does not

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11
U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code" or "Code"). "Pre-Code" shall reference
bankruptcy laws in effect prior to the 1978 enactment of the Bankruptcy Code.

[2] To the extent any conclusion of law is labeled as a finding of fact, but is actually a conclusion of law (or
the opposite), it is adopted as such.

discriminate unfairly and is "fair and equitable" with respect to the dissenting classes' impaired

claims under § 1129(b)(1). 11 U.S.C. § 1129; *RadLAX Gateway Hotel, LLC v. Amalgamated

Bank*, 566 U.S. 639, 641–42 (2012). As the plan proponent, the Debtor bears the burden of proof

by the preponderance of the evidence. *See, e.g., In re Salem Suede, Inc.*, 219 B.R. 922, 932

(Bankr. D. Mass. 1998). I also have an independent obligation to ensure that the Plan satisfies

confirmation requirements. *See id*.

## III.    **DISCUSSION**

In a separate decision, I have found that the Debtor is "liquidation solvent" for purposes

of the "best interests test" under § 1129(a)(7)(A)(ii).[3]  Based on the undisputed evidence

presented, I also find that the Debtor will be "balance sheet" solvent as of the effective date of

the Plan by at least $50 million and will have cash available during the proposed Plan term well

in excess of amounts required to pay general unsecured claims in full at any rate of interest

within the range of alternatives, without having to liquidate any significant assets.[4]  Given these

findings, I must determine whether the Plan satisfies the "best interests of creditors" test of §

1129(a)(7)(A)(ii) and is "fair and equitable" as to the rejecting general unsecured creditors in

---

[3] Dkt. No. 582 ("the "Solvency Decision").  Findings of fact and rulings of law made in the Solvency Decision are incorporated herein by reference.

[4] The balance sheet solvency of the Debtor as of the projected effective date of a plan is not in dispute. The liquidation valuation testimony by each of the experts was based on a baseline fair market valuation of the Debtor's assets including his interests in numerous limited partnerships and other entities.  Trial Tr. (Day 2 (Lessin)), 35:9–36:9; Trial Tr. (Day 3 (Darr)), 79:5–80:6; Aff. of Stephen B. Darr, Dkt. No. 484, Trial Ex. 47 (the "Darr Report"), 169; Aff. of Gary Blumenthal (the "Blumenthal Aff."), Dkt. No. 485; Expert Report of Mr. Blumenthal, Felix S. Betro, and Betro and Company, P.C. (the "Betro Report"), Trial Ex. 28. The Debtor introduced uncontroverted evidence regarding the fair market valuation through the testimony of Kayla Lessin, the asset manager for the Debtor's management company. Trial Tr. (Day 2 (Lessin)), 11:16–12:6, 35:9–36:9.

Class 6 as required by § 1129(b).[5]  To make those assessments, I must decide the appropriate rate

and amount of interest required to be paid by the Debtor with respect to allowed general

unsecured Class 6 claims that has accrued during the pendency of this case and that will accrue

after the effective date of the Plan until those claims have been paid in full.

As will be discussed at length below, the issues to be decided in this case are not without

controversy and raise the question of whether, and to what extent, the long-established "solvent

debtor exception" to the general prohibition of payment of interest on unsecured claims survived

the Code's enactment.  The parties have identified no controlling authority, and it is clear that

trial and appellate courts have reached different conclusions regarding the proper interpretation

of the Code with respect to the issues presented — and will likely continue to do so until the

issues are finally determined by the Supreme Court or Congress amends the statute.[6] I am

mindful that "[s]tatutory construction of the Bankruptcy Code is 'a holistic endeavor' requiring

consideration of the entire statutory scheme." *In re PG&E Corp.*, 610 B.R. 308, 310 (Bankr.

N.D. Cal. 2019) (quoting *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,

484 U.S. 365, 371, (1988)). As the relevant provisions of the Code allow for competing

---

[5] In the Objection, C&J asserted other ancillary objections as to which the parties have suggested certain corresponding amendments.  I will address these additional objections and the suggested amendments at a case management conference to be scheduled regarding procedures for filing an amended plan.

[6] Various commentators have discussed conflicting interpretations of the Code regarding the award of postpetition interest to solvent debtors and have advocated for certain amendments. *See, e.g.*,  Scott C. Shelley & Solomon J. Noh, *Show Me the Money: Another Look at Postpetition Interest in Solvent Debtor Chapter 11 Cases*, 24 Emory Bankr. Dev. J. 361, 376 (2008) (observing that "[i]n light of § 1129(b) and given the inexact nature of the 'payment in full' concept, the Bankruptcy Code should be interpreted to offer courts a substantial degree of discretion in determining what additional amounts ought to be awarded to creditors beyond the federal judgment rate amount"); Alexander F. Porter, *Postpetition Interest on Unsecured Claims in the Case of a Solvent Debtor: Toward a More Consistent Statutory Regime*, 81 S. Cal. L. Rev. 1341, 1351 (2008) (considering uncertainty regarding rate of interest rate for solvent debtors and suggesting certain Code amendments).

interpretations, I must consider the statutory scheme, historic context, and legislative intent to determine the proper application of the provisions of § 1129(a) to confirmation of the Plan.

**A.**   **PRE-CODE APPLICATION OF THE "SOLVENT DEBTOR EXCEPTION" AND THE POSITIONS OF THE PARTIES REGARDING ITS APPLICABILITY AFTER ENACTMENT OF THE CODE**

   **i.**   **Historical Underpinnings of the "Solvent Debtor Exception" to the General Prohibition of Postpetition Interest**

"Courts have heard disputes between solvent debtors and their creditors over the right to postpetition interest for nearly three hundred years [and o]ver the centuries, courts developed a solvent-debtor exception to the general bankruptcy rule that interest stops accruing on the petition date." *In re Ultra Petroleum Corp.*, 624 B.R. 178, 195–96 (Bankr. S.D. Tex. 2020). These disputes have continued since enactment of the Code, including as to whether the solvent debtor exception survived in any form beyond what may have been expressly incorporated into various provisions of the Code. While the starting point for statutory interpretation is certainly the text of the statute itself, *see United States v. Charles George Trucking Co.*, 823 F.2d 685, 688 (1st Cir. 1987), to fully appreciate the issues presented here, where the statute's meaning is not plain, it is necessary to consider the history of the solvent debtor exception in bankruptcy jurisprudence as context for the language of the statute and the intent of Congress.

Prior to enactment of the Code, the long-established general rule was that interest on claims stopped accruing upon commencement of bankruptcy proceedings. *See, e.g., Nicholas v. United States*, 384 U.S. 678, 682 (1966) (explaining that "[i]t is a well-settled principle of American bankruptcy law that in cases of ordinary bankruptcy, the accumulation of interest on claims against a bankruptcy estate is suspended as of the date the petition in bankruptcy is filed[, which rule is] grounded in historical considerations of equity and administrative convenience"); *Sexton v. Dreyfus*, 219 U.S. 339, 344 (1911) (recognizing that the rule that interest ceases to

accrue on unsecured debt upon commencement of bankruptcy proceedings is a fundamental

principle of English bankruptcy law, which is the basis of our system).  As described by the

Supreme Court, the Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, adopted the "fundamental

principles upon which [England's bankruptcy system] was administered . . . when we copied the

system," including the principle that interest on unsecured debt stops accruing at a certain date.

*Sexton v. Dreyfus*, 219 U.S. at 344.  Section 63 of the Bankruptcy Act of 1898, as amended by

the Chandler Act of 1938, expressly disallowed unmatured interest as part of a claim.  It

provided in pertinent part as follows:

> Debts of the bankrupt may be proved and allowed against his
> estate which are founded upon (1) a fixed liability as evidenced by
> a judgment or an instrument in writing, absolutely owing at the
> time of the filing of the petition by or against him, whether then
> payable or not, *with any interest thereon which would have been
> recoverable at that date* . . . (5) provable debts reduced to
> judgments after the filing of the petition . . . *less costs incurred and
> interest accrued after the filing of the petition* . . . .

Bankruptcy Act of 1938, ch. 575, § 63, 52 Stat. 840 (repealed) (emphasis added).

The principle on which the rule against postpetition interest rests is the protection of the

interests of other creditors.  *See, e.g., Vanston Bondholders Protective Comm. v. Green*, 329

U.S. 156, 166, (1946) (recognizing general principle that where the power of the debtor to pay

its obligations is suspended by law, interest should not be paid because the delay is occasioned

by the court's desire to preserve and protect the estate for the benefit of all interests involved).

As the United States Court of Appeals for the First Circuit has noted,

> Two reasons are given for the rule [against postpetition interest]:
> (1) interest payments are penalties or damages assessed against the
> debtor for his detention of the creditor's money . . . and therefore it
> would be unjust to allow the creditor to recover such penalties or
> damages from other creditors who were not to blame for the

detention; and (2) the bankruptcy court itself, not the debtor, detained the money after the petition was filed.

*Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 269

(1st Cir. 1982) (citations omitted) (applying pre-Code law).

Notwithstanding the general prohibition on the accrual of interest on unsecured claims, where the debtor possessed sufficient assets to pay all claims in full with interest, such that the payment of interest to one creditor did not affect the recovery of other creditors, principles of fairness and equity dictated that creditors be paid all the interest to which they were otherwise entitled—often at a rate determined by the terms of their contracts with the debtor. *See Am. Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.*, 233 U.S. 261, 266–67 (1914) (concluding that "in the rare instances where the assets ultimately proved sufficient for the purpose, that creditors were entitled to interest accruing after adjudication"); *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) ("[W]here there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for" contractual interest provision); *Sword Line, Inc. v. Indus. Comm'r of N.Y.*, 212 F.2d 865, 870 (2d Cir. 1954) (explaining that "interest ceases upon bankruptcy in the general and usual instances noted . . . unless the bankruptcy bar proves eventually nonexistent by reason of the actual solvency of the debtor"); *Johnson v. Norris*, 190 F. 459, 466 (5th Cir. 1911) (determining that debtors "should pay their debts in full, principal and interest to the time of payment whenever the assets of their estates are sufficient"). This pre-Code "solvent-debtor exception" was expressly endorsed by the Supreme Court and applied consistently among the federal circuit courts, notwithstanding the disallowance of unmatured interest incorporated in the Bankruptcy Act of 1898 and the Chandler Act of 1938. *See, e.g., Am.*

*Iron* & Steel, 233 U.S. at 266–67; *Ruskin*, 269 F.2d at 832; *Sword Line*, 212 F.2d at 870;

*Johnson*, 190 F. at 466.

By way of example, in a railway receivership case, the Supreme Court applied the solvent

debtor exception and determined that "[e]ven in bankruptcy, and in the face of the argument that

the debtor's liability on the debt and its incidents terminated at the date of adjudication, and as a

fixed liability was transferred to the fund, it has been held, in the rare instances where the assets

ultimately proved sufficient for the purpose, that creditors were entitled to interest accruing after

adjudication." *Am. Iron & Steel*, 233 U.S. at 266–67.  In *American Iron & Steel*, the Supreme

Court cited favorably to decision of the United States Court of Appeals for the Fifth Circuit in

*Johnson*, which had held that the disallowance of postpetition interest provided for in Sections

63 and 65e of the Bankruptcy Act of 1898 did not apply to solvent cases, because such

prohibition serves only to effect an equitable distribution among creditors in an insolvent estate.

*See id*. at 267; *see also Johnson*, 190 F. at 461–62.  The *Johnson* court noted that the rule in

England dating back to the 18th century was that creditors are entitled to interest on their claims

before the bankrupt receives any surplus, and further explained:

> In 1743, long before the passage of our first bankruptcy act, Lord
> Chancellor Hardwicke, in Bromley v. Goodere, 1 Atkyns, 75,
> considered and decided, under the English statutes, the exact
> question involved here.  It was a contest between the creditors and
> the heirs of the bankrupt over a surplus.  The debts had been paid
> in full, principal and interest; the interest being computed, as the
> English statute required, up to the date of the commission.  The
> creditors claimed the subsequently accruing interest out of the
> surplus, and the bankrupt's heirs claimed the entire surplus,
> pleading the bankrupt's discharge.  The Lord Chancellor held that
> the creditors were entitled to have the subsequently accruing
> interest paid out of the surplus.  This rule was approved in later
> English cases.
>
> Blackstone states the usual English rule to be that all interest on
> debts shall cease from the time of issuing the commission, yet, in

> case of a surplus left after payment of every debt, such interest
> shall again revive.  2 Blackstone's Commentary, 488.

190 F. at 465; *see also, generally*, *In re Ultra Petroleum Corp.*, 624 B.R. at 196 (discussing in

detail the historical roots of the general rule against allowance of postpetition interest and the

solvency exception recognized under 18th century English jurisprudence).  Other federal circuit

courts also adopted the reasoning of *Johnson,* requiring payment of postpetition interest in

solvent debtor cases.  *See, e.g., Littleton v. Kincaid*, 179 F.2d 848, 852 (4th Cir. 1950) (citing

*Am. Iron & Steel* and *Johnson*, and concluding that the "inequality" resulting from "forced

distribution in receivership  [of] debts carrying different rates of interest . . . disappears when

there is a surplus and then interest is allowed even while the funds are *in custodia legis*");

*Ruskins*, 269 F.2d at 832.

The First Circuit, applying pre-Code law, expressly adopted the solvent debtor exception

in *Debentureholders*, 679 F.2d at 269. Reversing a lower court's approval of a plan of

reorganization for a solvent debtor that did not provide for postpetition interest to the holders of

convertible debentures, the First Circuit held that the plan was not fair and equitable because it

failed to provide for the entire amount of postpetition interest to which claim holders were

entitled under contracts valid under state law and explained:

> Where the debtor is solvent, the bankruptcy rule is that where there
> is a contractual provision, valid under state law, providing for
> interest on unpaid [installments] of interest, the bankruptcy court
> will enforce the contractual provision with respect to both
> instalments due before and [installments] due after the petition was
> filed.  This rule is fair and equitable inasmuch as the solvent
> debtor's estate will have been enriched by the bankruptcy trustee's
> use of money which the debtor had promised to pay promptly to
> the creditor, and, correspondingly, the creditor will have been
> deprived of the opportunity to use the money to his advantage.
> Moreover, the rule does not in any way affect any creditor other
> than the claimant of interest on interest.  Finally, the rule is in
> harmony with the settled English and American law that when an

> alleged bankrupt is proved solvent, the creditors are entitled to
> receive post-petition interest before any surplus reverts to the
> debtor.

*Id*. at 269–70 (citations omitted). The First Circuit went on to state that "[e]ven if it is not the law

that in the case of a solvent debtor any compulsory exchange of a creditor's contractual right to

cash for a substitute which he did not want and which benefits only stockholders would make a

reorganization plan unfair and inequitable, . . . in the case at bar [the plan is unfair and

inequitable because it] does not provide in exchange for the creditor's contractual right just

compensation." *Id*. at 270 (citations omitted).

In the pre-Code solvent debtor cases, courts generally did not "weigh the equities" to

determine whether to award postpetition interest or the amount to be awarded.  Rather, the courts

often focused on the question of solvency and, to the extent enforceable under applicable non-

bankruptcy law, applied the interest rate under applicable prepetition contracts.  The Seventh

Circuit Court of Appeals summed up the role of courts in solvent debtor cases as follows:

> The fact that a proceeding is equitable does not give the judge a
> free-floating discretion to redistribute rights in accordance with
> [the judge's] personal views of justice and fairness, however
> enlightened those views may be. The function of equitable
> considerations in a bankruptcy proceeding is to guide the division
> of a pie that is too small to allow each creditor to get the slice for
> which he originally contracted.  Hence if the bankrupt is solvent
> the task of the bankruptcy court is simply to enforce creditors'
> rights according to the tenor of the contracts that created those
> rights.
>
> . . .
>
> We have not forgotten the venerable principle that a bankruptcy
> court can refuse to award interest that accrues on a creditor's claim
> after the petition for bankruptcy is filed. But it is designed for
> cases where there is not enough money to pay all the creditors-so
> that there is a question whether one creditor should get interest
> while another doesn't even recover principal-and not for cases like
> this, where the debtor is solvent.

*In re Chi., Milw., St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 528–29 (7th Cir. 1986) (citations omitted).

However, some cases interpreting pre-Code law did discuss the balancing of equities in determining entitlement to interest on claims in solvent debtor cases. For example, in *United States v. Robinson (In re D.C. Sullivan & Co., Inc.)*, citing *Debentureholders* and numerous other decisions, the First Circuit observed that bankruptcy courts balance equities in awarding interest in solvent debtor cases:

> The [Supreme] Court has recently reaffirmed the balancing of equities approach: "We have noted that 'the touchstone of each decision on allowance of interest in bankruptcy ... has been a balance of equities between creditor and creditor or between creditors and the debtor.' *Vanston Bondholders Protective Committee v. Green*, 329 U.S. at 165, 67 S.[]Ct. at 241." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. [235, 248 (1989)].

929 F.2d 1, 6 (1st Cir. 1991) (focusing on the balance of equities among creditors in a solvent debtor case, where no creditor objected to their treatment or to the payment of interest to the IRS, and determining the IRS was entitled to the interest it would otherwise be entitled to under non-bankruptcy statutory law because there were "no equities to balance here"). Looking to interpretation of the "fair and equitable" standard as applied by other courts in railroad and other cases, the First Circuit noted that:

> The Seventh Circuit grappled with the same issue that confronts us in a railroad reorganization case, *Matter of Chicago, Milwaukee, St. Paul Pac. [R.R.] Co.*, 830 F.2d 758 (7th Cir. 1987). The railroad turned out to be solvent. The government took the position that it was entitled to interest at the [higher] rates set in 26 U.S.C. §§ 6621 and 6622, and not at the rate of 7.5/8.5%, which was the interest rate determined by the district court to be fair and equitable under 11 U.S.C. § 205(e) of the Bankruptcy Act. In affirming the rate of interest set by the district court, the Seventh Circuit followed the balancing of the equities teaching of the Court in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. at 165, 67 S.[]Ct. at 241. 830 F.2d at 765-66.

*In re D.C. Sullivan & Co.*, 929 F.2d at 6.

### ii.     Positions of the Parties

The parties disagree whether the solvent debtor exception survived the enactment of the

Code, except as may be expressly incorporated in certain provisions of the Code.  Since I have

determined that the Debtor is liquidation solvent, the creditors in Class 6 are entitled to pendency

interest at "the legal rate," a term which is not defined in the Code.  The Debtor argues that the

"best interests" test under § 1129(a)(7)(A)(ii), applying § 726(a)(5), requires only that the Plan

provide for pendency interest at the federal judgment rate determined under 28 U.S.C. § 1961(a)

(the "federal judgment rate"). C&J disagree, asserting instead that the rate for pendency interest

should be determined by state law, such as may be provided by contract or statute applicable to

claims reduced to judgment.  C&J describe "the legal rate" as a non-bankruptcy rate, which

could vary from creditor to creditor, and have objected to confirmation of the Plan because it

does not provide for C&J to be paid pendency interest with respect to their judgment claims at

the Massachusetts judgment rate of 12% per annum.

C&J have also objected to confirmation of the Plan on the basis that the plan is not "fair

and equitable" to the rejecting general unsecured creditors in Class 6 as required by § 1129(b).

Section 1129(b)(1) permits a debtor to confirm a Chapter 11 plan, even if a class of unsecured

creditors has not accepted the plan, provided, among other requirements, "the plan . . . is fair and

equitable" to the rejecting class. 11 U.S.C. § 1129(b). Section 1129(b)(2) states that, "[f]or the

purpose of this subsection, the condition that a plan be fair and equitable with respect to a class

*includes* the following requirements." *Id*. § 1129(b)(2)(B) (emphasis added). With respect to

unsecured creditors, § 1129(b)(2)(B) provides that a plan is fair and equitable with respect to a

class if "(i) the plan provides that each holder of a claim of such class receive or retain on

account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 . . . ." *Id*. This provision is often referred to as the "absolute priority rule." The Debtor and C&J disagree on the application of the "fair and equitable" requirement in this case.

The Debtor argues that the statute is clear on its face and that the absolute priority rule in § 1129(b)(2)(B)(i) merely requires that interest be paid from the effective date of the Plan at a rate to ensure that general unsecured creditors receive payments having a present value equal to each of their allowed claims. Because Congress referenced "the allowed amount of such claim" in § 1129(b)(2)(B), the Debtor contends the Court need only look to § 502(b), which provides that an allowed claim excludes interest that was "unmatured" as of the petition date. *Id*. § 502(b)(2). As applied in this case, the Debtor argues that § 502(b) establishes the "allowed" amount of each general unsecured claim and that the absolute priority rule and fair and equitable standard are satisfied because the Debtor proposes to pay the allowed Class 6 claims in full with interest at 3.25%. The Debtor asserts the proposed interest rate is an adjusted market rate equaling or exceeding the requirements of the absolute priority rule.[7]

For the Debtor, the inquiry should end there. The Debtor asserts that pendency interest should be calculated at the federal judgment rate and paid only if required to satisfy the "best

---

[7] The Debtor calculated his proposed market rate using the methodology suggested in *Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2004) and introduced expert testimony regarding the calculation. *See* Trial Tr. (Day 2 (Darr)), 164:18–166:22. C&J did not offer any evidence regarding the rate of interest necessary to provide Class 6 creditors with the present value of the allowed amount of their claims and do not seem to contest the Debtor's calculation. C&J's opposition focuses on whether the solvent debtor exception and the "fair and equitable" requirement of § 1129(b) requires more than this baseline amount.

interests test" of § 1129(a)(7)(A)(ii). The Debtor further asserts that the provisions of §§ 502(b),

726(a)(5), and 1129(b)(2)(B) are clear and unambiguous and that the Court should not adopt a

"free-floating solvent debtor exception and a balancing of the equities test."  Memo. of Law 23

(citing *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 976 (2017) for the proposition that

where a statute is clear on its face, the equitable powers of the bankruptcy court must be

exercised within the explicit confines of the Code and alluding to the Seventh Circuit's

admonition in  *In re Chi., Milw., St. Paul & Pac. R.R. Co.*, 791 F.2d at 528 that "[t]he fact that a

proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in

accordance with his personal views of justice and fairness . . ."). The Debtor contends viewing

the statute in any other way would be "contrary to the Supreme Court's instruction in *Jevic* []

that a court should apply the statute as written and that a bankruptcy court cannot 'alter the

balance struck by statute.'"  Memo. of Law 23 (quoting *Jevic*, 137 S. Ct. 973 at 987).

Taking the opposite view, C&J argue that the statute is not clear and that § 1129(b) uses

broad language that must be interpreted through the lens of the "solvent debtor exception" firmly

established in English and American insolvency law prior to enactment of the Code.  C&J assert

that, where a debtor is solvent, in order to achieve confirmation, a plan must provide for the

payment of postpetition interest at a rate established by applicable state law for each claim to

satisfy the "best interests test" of § 1129(a)(7)(A)(ii) and the "fair and equitable" requirement of

§ 1129(b).

As such, the parties disagree regarding whether the "fair and equitable" requirement of §

1129(b), the "best interests test" of § 1129(a)(7)(A)(ii), or general solvent debtor principles

incorporated in the Code require payment of pendency interest at a rate greater than the federal

judgment rate and payment of post-effective date interest at a rate greater than required to

provide payment of the present value of the allowed amount of each general unsecured claim

where the Debtor will be substantially solvent on the effective date of the proposed Plan.

## B.    DOES A "SOLVENT DEBTOR EXCEPTION" APPLY IN DETERMINING WHETHER A PLAN IS "FAIR AND EQUITABLE" UNDER § 1129(b)?

I find sufficient precedent, historical context, legislative history, and foundation in the

Code to conclude that Congress intended bankruptcy courts to engage in a consideration of the

equities to determine the appropriate amount of interest to be paid on general unsecured claims

to afford fair and equitable treatment where a plan proposed by a solvent debtor has been

rejected by that class.[8]   Congress's use of the phrase "fair and equitable" in § 1129(b) was

intended to codify at least a century of bankruptcy jurisprudence discussed above and grounded

the solvent debtor exception as it relates to impaired creditors in that provision.

> Congress chose [the words "fair and equitable"] with care.  They
> originated in judicial decisions beginning at the turn of the century,
> and have appeared, in one act or another, in statutory
> reorganization law for over 70 years.  They thus reflect and stand
> proxy for almost a century of judicial decision-making, and over
> half a century of legislative guidance.

7 Collier on Bankruptcy ¶ 1129.03[4] (Richard Levin & Henry J. Sommer eds., 16th ed.);  *see*

*also Bank of America Nat. Tr. and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444

(1999) (describing historical understanding of pre-Code requirement that a plan of reorganization

be "fair and equitable" to a dissenting class of impaired creditors in the context of discussing the

"new value corollary" to the absolute priority rule).

---

[8] While I am sensitive to the concern raised by the Debtor that this Court will adopt a "free-floating solvent debtor exception and a balancing of the equities test," Memo. of Law 23, as will be discussed below, well-developed jurisprudence and the evidentiary record in this and in future cases will dictate the course in applying the "solvent debtor exception" in these rare cases – unless a future statutory amendment or other controlling appellate authority mandates a different approach.

Use of the term "includes" in the opening clause of § 1129(b)(2) demonstrates that

Congress did not intend the minimum requirements adopted from pre-Code practice and

incorporated from earlier versions of the bill prior to enactment[9] that are set out in subsections A

(secured creditors), B (unsecured creditors), and C (interests) to limit the meaning of "fair and

equitable."  *See* 11 U.S.C. § 102(3) (the term "includes" is not limiting); *see also In re Energy*

*Future Holdings Corp.*, 540 B.R. 109, 115 (Bankr. Del. 2015) (discussion of § 1129(b) and term

"includes" in *dicta*; noting "[t]he import of the use of the word 'includes' in section 1129(b)(2) is

less than clear [but recognizing that a]t most, it allows a court to weigh equitable considerations

in deciding whether to award post-petition interest"); *In re Bjolmes Realty Tr.*, 134 B.R. 1000,

1006-07 (Bankr. D. Mass. 1991) (in examining new value corollary to absolute priority rule,

determining that the pre-Code exception remained in the law under § 1129(b) and noting that (i)

"[e]ven an opaque statute should be interpreted in light of case law existing at the time of its

enactment[,]" (ii) subsections (i) and (ii) of § 1129(b)(2) "do not purport to be a complete

statement of the fair and equitable principle[,]" (iii) the "overarching command of § 1129(b)(1)

is that the plan be 'fair and equitable[,]'" (iv) "[s]ubparagraph (2) states that this command

'includes' the specific requirements there set forth"  and (v) "[t]he word 'includes' is 'not

limiting'"); *In re Lumber Exch. Ltd. P'ship*, 125 B.R. 1000, 1007 (Bankr. D. Minn. 1991), *aff'd*

*on other grounds*, 134 B.R. 354 (D. Minn. 1991), *aff'd*, 968 F.2d 647 (8th Cir. 1992) (in

determining whether new value exception survived enactment, finding "such a determination is

unnecessary, and would be inappropriate, because § 1129(b)(2) legislatively prescribes what the

'fair and equitable' standard minimally includes under the Bankruptcy Code in order for a plan

to be confirmed over the objection of a class); *In re Henke*, 90 B.R. 451, 455 (Bankr. D. Mont.

---

[9] *See* Part III.A.i., *supra*.

1988) (finding that "proper statutory construction dictates that by using the term 'includes' in §

1129(b)(2), Congress clearly intended that the examples set forth in that section are not limiting

but rather invite an open ended approach . . . ").

There does not appear to be anything in the legislative history of § 1129(b)(2) that

suggests that Congress intended to abrogate the established solvent debtor exception.  "The

normal rule of statutory construction is that if Congress intends for legislation to change the

interpretation of a judicially created concept, it makes that intent specific."  *Midlantic Nat'l Bank

v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986); *see also Dewsnup v. Timm*, 502 U.S. 410,

419 n.4 (1992) (declining to interpret a provision of the Bankruptcy Code that would reflect

"major changes in pre-Code practice . . . that [are] not the subject of at least some discussion in

the legislative history").  In *Midlantic National Bank*, the Supreme Court recognized that § 554

governing abandonment included the "established corollary" in the case law that a trustee could

not exercise his abandonment powers in violation of law. *See* 474 U.S. at 500–501, 506

(determining, in addition to a presumption of continuity with pre-Code practice, that a contrary

result would render the abandonment doctrine inconsistent with other Code provisions

embodying the principle that "the trustee is not to have carte blanche to ignore nonbankruptcy

law"). This was so even though "[§] 554, unlike § 1129(b), contains no ambiguous language and

no phrase having a settled meaning, nor does it use the word 'includes' as a clear indication that

its requirements are nonlimiting." *In re Bjolmes Realty Tr.*, 134 B.R. at 1006–07.

Further, other legislative history can be read to indicate that Congress understood the

solvent debtor exception survived enactment of the Code.  In 1994, acting directly in response to

the holding in *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994), Congress repealed

subsection (3) from § 1124 of the Code, which had provided that treatment of a claim is

unimpaired if the plan provides for payment of the allowed claim in full on the effective date.

*See* H.R. Rep. 103–835, at 48 (1994), as reprinted in 1994 U.S.C.C.A.N. 3340, 3356.  In *New*

*Valley*, the court found that the solvent debtor did not have to pay postpetition interest to the

bondholders by merely proposing to pay their claims in full on the effective date, rendering them

unimpaired and not subject to the fair and equitable requirements of § 1129(b), or even the best

interests test, since they were deemed to have accepted the plan. *See In re New Valley Corp.*, 168

B.R. at 80 (concluding "that a Chapter 11 debtor that proposes a plan that provides for payment

of the allowed claims in full, in cash, on the effective date of its plan is not compelled to pay

postpetition interest merely because it is solvent"). In repealing § 1124(3), the House Committee

on the Judiciary explained:

> In a recent Bankruptcy Court decision in *In re New Valley Corp.*, 168
> B.R. 73 (Bankr. D.N.J. 1994), unsecured creditors were denied the right
> to receive postpetition interest on their allowed claims even though the
> debtor was liquidation and reorganization solvent.  The *New Valley*
> decision applied section 1124(3) of the Bankruptcy Code literally by
> asserting, in a decision granting a declaratory judgment, that a class that
> is paid the allowed amount of its claims in cash on the effective date of a
> plan is unimpaired under section 1124(3), therefore is not entitled to
> vote, and is not entitled to receive postpetition interest. … In order to
> preclude this unfair result in the future, the Committee finds it
> appropriate to delete section 1124(3) from the Bankruptcy Code.

> As a result of this change, if a plan proposed to pay a class of claims in
> cash in the full allowed amount of the claims, the class would be
> impaired, entitling creditors to vote for or against the plan of
> reorganization. If creditors vote for the plan of reorganization, it can be
> confirmed over the vote of dissenting class of creditors only if it
> complies with the "fair and equitable" test under section 1129(b)(2) of
> the Bankruptcy Code and it can be confirmed over the vote of dissenting
> individual creditors only if it complies with the "best interests of
> creditors" test under section 1129(a)(7) of the Bankruptcy Code.

> The words "fair and equitable" are terms of art that have a well[-]
> established meaning under the case law of the Bankruptcy Act as well as
> under the Bankruptcy Code. *Specifically, courts have held that where an*
> *estate is solvent, in order for a plan to be fair and equitable, unsecured*

> *and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery.*

H.R. Rep. No. 103–835 at 47–48, as reprinted in 1994 U.S.C.C.A.N. 3340, 3356–57 (emphasis added); *see also In re Energy Future Holdings Corp.*, 540 B.R. at 120 (quoting H.R. Rep. No. 103–835, 47–48, as reprinted in 1994 U.S.C.C.A.N. 3340).   The court in *New Valley* had held that the solvent debtor exception was limited by § 502(b)(2), *see* 168 B.R. at 77–78, but in "preclud[ing] this unfair result in the future," Congress left § 502(b)(2) in place, *see, e.g.*, H.R. Rep. No. 103–835 at 48, as reprinted in 1994 U.S.C.C.A.N. at 3357 (stating "[t]he amendments to section 726(a) of the Code, governing the distribution of property of the estate in a chapter 7 liquidation, conform to the amendments to section 1129(b) and 502(b)").   Failure to further amend the Code can be viewed to demonstrate Congress's intent and understanding that the solvent-debtor exception is consistent with § 502(b)(2).  *See, e.g., In re Ultra Petroleum*, 624 B.R. at 198 (determining that "[n]othing in the legislative history of the Bankruptcy Code or § 502(b)(2) suggests that Congress intended to defang the solvent-debtor exception"). Reflecting on the 1994 amendments, the United States Court of Appeals for the Sixth Circuit also noted the remarks of the Chairman of the Judiciary Committee as further demonstrating Congress's intent to preserve the solvent debtor exception.

> The absolute priority rule imposes somewhat different requirements when a solvent debtor seeks confirmation of its plan. The legislative history of the Bankruptcy Code makes clear that equitable considerations operate differently when the debtor is solvent.  "[C]ourts have held that where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including post-petition interest, before equity holders may participate in any recovery."

*Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*,

(*"Dow III"*), 456 F.3d 668, 678 (6th Cir. 2006) (quoting 140 Cong. Rec. H10, 752–01, H10, 768

(1994) (statement of Rep. Brooks, Chairman of the Committee on the Judiciary and co-author of

the Bankruptcy Reform Act of 1994)).  Divining the intent of Congress in relation to specific

provisions of a statute can be an imprecise and often unsatisfying exercise given the nature of the

legislative process and the diverse goals of the parties involved in the process.[10]  Even with those

---

[10] Collier describes the legislative history of § 1129 as "somewhat tortuous, owing in part to its importance" stating as follows regarding its implementation in the Code:

> After some procedural wrangling with the Senate, the House's version of the bankruptcy bill prevailed. But it contained a drastically different treatment of nonconsensual reorganizations which implicated the absolute priority rule. Whereas the original House bill contained only one subsection on nonconsensual confirmation that did not use the words "fair and equitable," the bill that emerged for final consideration included two subsections on the topic, and explicitly incorporated the phrase "fair and equitable." The first subsection harkened back to H.R. 6 by providing that a court could cram down a nonconsensual plan over the dissent of any class only if the plan were, among other things, "fair and equitable." Although the bill did not attempt to define this concept explicitly, Congress's prior efforts to define it were not lost. The second subsection on cramdown retained the various treatments developed in earlier bills as examples of fair and equitable treatment.
>
> . . .
>
> There was no formal conference report on the resolution of differences between the House and Senate Bills. There were, however, extensive and identical remarks introduced into the Congressional Record by the respective floor managers, Representative Edwards and Senator DeConcini. As the floor remarks made clear:
>
> > Although many of the factors interpreting "fair and equitable" are specified in paragraph (2), others, which were explicated in the description of section 1129(b) in the House Report, were omitted from the House amendment to avoid statutory complexity and because they would undoubtedly be found by the court to be fundamental to "fair and equitable" treatment of a dissenting class.
>
> These statements from the floor managers were intended to be in the nature of a conference report, and the Supreme Court has stated:
>
> > Because of the absence of a conference and the key roles played by Representative Edwards and his counterpart floor manager Senator

limitations, I am persuaded that Congress must have been cognizant of the long-established

solvent debtor exception and that there is no evidence of any intent to abrogate centuries of law

that had developed by enacting the Bankruptcy Code.

In *Gencarelli v. UPS Capital Business Credit*, the First Circuit discussed the solvent-

debtor exception in a case applying §§ 502 and 506 of the Code. 501 F.3d 1, 7 (1st Cir. 2007).

The issue in *Gencarelli* was the enforceability of a prepayment penalty as a component of a

secured claim under § 506(b) or as an unsecured claim determined under § 502. *See id*. at 8. The

parties disagree as to the import and precedential effect of the First Circuit's discussion of the

solvent debtor exception in that case on fair and equitable and best interests determinations under

§ 1129. The First Circuit in *Gencarelli* stated:

> Let us be perfectly clear.  This is a solvent debtor case and, as
> such, the equities strongly favor holding the debtor to his
> contractual obligations as long as those obligations are legally
> enforceable under applicable non-bankruptcy law.  When the
> debtor is solvent, "the bankruptcy rule is that where there is a
> contractual provision valid under state law, . . . the bankruptcy
> court will enforce the contractual provision."  *Debentureholders
> Protective Comm. Of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679
> F.2d 264, 269 (1st Cir. 1982); *see Dow Corning*, 456 F.3d at 679
> (noting that in solvent debtor cases, "courts have generally
> confined themselves to determining and enforcing whatever pre-
> petition rights a given creditor has against the debtor"); *In re Chi.,
> Milw., St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986)
> (observing that "if the bankruptcy is solvent the task for the
> bankruptcy court is simply to enforce creditors' rights according to
> the tenor of the contracts that created those rights").

*Id*.  The First Circuit concluded that, notwithstanding the debtor's arguments and the lower

court's determination that the prepayment penalty was not "reasonable" and therefore not

---

DeConcini, we have treated their floor statements on the Bankruptcy
Reform Act of 1978 as persuasive evidence of congressional intent.

7 Collier on Bankruptcy ¶ 1129.LH (citations omitted).

enforceable under § 506(b) of the Code, the prepayment penalties were appropriately allowed

under § 502 where such penalties were clearly due under contractual obligations enforceable

under applicable state law, analogous to the circumstance where "unsecured creditors may

recover their attorneys' fees, costs and expenses from the estate of a solvent debtor where they

are permitted to do so by the terms of their contract and applicable non-bankruptcy law." *Id*. at 6

(quoting *Dow III*, 456 F.3d 668, 683). Because the First Circuit did not analyze the prepayment

penalties at issue in *Gencarelli* as an equivalent of "unmatured interest" that would have been

disallowed under § 502(b)(2) or discuss the applicability of the best interest test of §

1129(a)(7)(A)(ii) or the fair and equitable requirements of § 1129(b) as each of them relate to

postpetition interest, I agree with the Debtor that the First Circuit's discussion of the solvent

debtor exception is distinguishable *dicta* in relation to the issues presented by C&J's Objection to

the Debtor's Plan. While only *dicta*, it is noteworthy that the First Circuit appears to

acknowledge that some courts have recognized the continuing viability of a solvent debtor

exception after enactment of the Code in citing to *Dow III* in its discussion for, among other

things, the proposition "that in solvent debtor cases, 'courts have generally confined themselves

to determining and enforcing whatever pre-petition rights a given creditor has against the

debtor.'" *Id*. at 7 (commenting that "[t]his is a solvent debtor case and, as such, the equities

strongly favor holding the debtor to his contractual obligations as long as those obligations are

legally enforceable under applicable non-bankruptcy law") (citations omitted).

Interpreting § 1129(b) as not abrogating the solvent debtor exception does not conflict

with § 502(b). Under § 502(b), a court shall determine the amount of and allow a claim, "except

to the extent that" it falls within one of the categories listed in § 502(b)(1)–(9). 11 U.S.C. §

502(b). The statutory text is clear, and numerous decisions have recognized, that § 502(b) claims

disallowance rules apply whether a debtor is solvent or not. *See In re Ancona*, No. 14-10532-CGM, 2016 WL 828099, at *6 (Bankr. S.D.N.Y. Mar. 2, 2016) (rejecting the argument that "a court must first find a debtor to be insolvent" before applying § 502(b)); *Flanigan v. Samalex Tr. (In re Flanigan)*, 374 B.R. 568, 575 (Bankr. W.D. Pa. 2007) (rejecting any "judicially-crafted exception" to § 502(b) for solvent debtor cases); *In re Farley, Inc.*, 146 B.R. 739, 747–48 (Bankr. N.D. Ill. 1992) (concluding whether the debtor is solvent is "irrelevant" under § 502(b))*; In re PPI Enters. (U.S.) Inc.*, 228 B.R. 339, 345–46 (Bankr. D. Del. 1998) (rejecting the argument that § 502(b) "should not apply in a solvent debtor case") *aff'd*, 324 F.3d 197 (3rd Cir. 2003); *In re Federated Dep't. Stores, Inc.*, 131 B.R. 808, 817 (S.D. Ohio 1991) (rejecting the argument that "a bankruptcy court may depart from [§ 502(b)] any time the debtor is solvent). While § 502(b)(2) is unambiguous and provides that postpetition interest cannot be included as a component of an "allowed" claim, there is a significant distinction between whether postpetition interest can be *part* of an allowed claim and whether there are circumstances under which the debtor may be required to pay postpetition interest *on* an allowed claim. *See In re Energy Future Holdings Corp.*, 540 B.R. at 113 (observing "distinction . . . between the allowed amount of the claim and post-petition interest on the allowed claim").[11]

---

[11] Section 502(b)(2)'s disallowance of unmatured interest has its historical roots in the Bankruptcy Act's Section 63, which codified the general rule against allowance of postpetition interest.

> Returning to the present-day Code, it can readily be seen that § 502(b)(2) is nothing new, but rather is derived from—and closely analogous to-- § 63. Indeed, the Code's legislative history indicates that the proposal to disallow claims for unmatured interest is consistent with "present law." H.R.Rep. No. 95-595, 95th Cong., 1st Sess. (1977), at 353. Thus, the enactment of § 502(b)(2) would not seem to be a repudiation of either the solvency exception in general, or the recognition of contract interest rates in particular. *See generally, Cohen v. De La Cruz*, 523 U.S. 213, 118 S. Ct. 1212 (1998) ("We … 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear

For all of these reasons, I conclude that, in solvent debtor cases, the requirement in §

1129(b) that a plan of reorganization be "fair and equitable" may require the payment of

postpetition interest on allowed claims in amounts greater than would be required to satisfy the

"best interests test" of § 1129(a)(7)(A)(ii) and the "absolute priority rule" set out in §

1129(b)(2)(B).  Further, as will be discussed below, I find that the record in this case requires

such a result.[12]

## C.   "GOOD NEWS" FOR THE SOLVENT DEBTOR OR IMPAIRED CREDITORS? ESTABLISHING AN APPROPRIATE INTEREST RATE TO BE PAID FOR THE PLAN TO BE "FAIR AND EQUITABLE" IN THIS CASE

Mr. Mullins's most significant assets primarily consist of fractional interests in entities

that own direct and indirect interests in mature, multi-unit affordable housing developments,

which produce cash distributions from rental income and refinancing proceeds.  *See* Trial Tr.

(Day 1 (Lessin)), 110:2–13, 114:6–15; Trial Tr. (Day 3 (Darr)), 48:11–24; Schedule B at 5–19,

---

indication that Congress intended such a departure' …'" (citation omitted)).

*In re Dow Corning Corp. (Dow II)*, 244 B.R. 678, 684 (Bankr. E.D. Mich. 1999); *see also In re Ultra Petroleum*, 624 B.R. at 198 (same, citing *Dow II*).  Section 502(b)(2), which is analogous to § 63 of the pre-Code Bankruptcy Acts, can be viewed as no more at odds with the solvent debtor exception than were § 63 of the Bankruptcy Acts of 1898 and 1938.  *See, e.g.*, *In re Ultra Petroleum Corp.*, 624 B.R. at 198.

[12] Because I have made that determination, I need not reach the significant question of whether the solvent debtor exception is founded more generally in an "equitable right" inherent in insolvency proceedings under the Code rather than in § 1129(b) or any other specific provisions of the Code.  *Cf. In re Ultra Petroleum Corp.*, 624 B.R. at 202–03 (applying the solvent debtor exception to the treatment of a class of unimpaired bondholders as an "equitable right to be paid the full amount they are validly owed before . . . equity holders receive any recovery" and stating that "[n]o single provision of the Bankruptcy Code explains the solvent debtor exception on its own.").  I acknowledge that, in certain circumstances not applicable with respect to the Plan at issue in this case, application of the solvent debtor exception would be less grounded in the text of the statute as it may be applied to unimpaired classes of claims. Application of the solvent debtor exception also presents issues in interpreting the language of the best interests test of § 1129(a)(7)(A)(ii) (as discussed below) arising in the context of an objection to confirmation by a dissenting class of equity or subordinated creditors that I have considered generally in interpreting the Code, but that I do not have to reach in this case because no such objection has been presented by holders of such interests.

Tr. Ex. 1. Mr. Mullins began developing certain of these properties with C&J in the 1970's as

Corcoran, Mullins, Jennison Inc. ("CMJ Inc."). *See* Trial Tr. (Day 3 (Mullins)), 134:16–25. In

March 1987, Messrs. Corcoran, Mullins, and Jennison entered into an agreement (the "1987

Agreement") establishing the terms of their continued relationship in CMJ Inc. and the related

operation of the business interests in which they hold percentage ownership interests, as the

parties developed other projects independently of each other. 1987 Agreement, Tr. Ex. 34. Since

1987, there have been a number of disputes between the parties related to the 1987 Agreement.

*See* Trial Tr. (Day 3 (Mullins)), 135:20–23.

The C&J claims arise out of amended judgments entered in their favor by the Suffolk

Superior Court in Civil Action No. 1484-CV-02302-KWS on counterclaims asserted for breach

of contract and fiduciary duty with respect to one such dispute.[13] *See* Corcoran Proof of Claim 4-

3, Trial Ex. 8; Jennison Proof of Claim 5, Trial Ex. 9; Agreed Facts ¶¶ 16–20. The C&J

judgments total $14,566,859.62 and $4,832,556.60, respectively, including accrued interest as of

the filing of the Debtor's Chapter 11 case on May 8, 2019. *See id.*; *see also* Stipulation by Debtor

Joseph R. Mullins and Estate of Joseph Corcoran, Gary Jennison and the Debtor with Respect to

Judgment Amounts Through May 7, 2019, Dkt. No. 527. At the time that the Debtor filed his

Chapter 11 proceeding, C&J were attempting to attach the Debtor's assets to secure payment of

the substantial judgments awarded to them, which were accruing post-judgment interest at the

---

[13] A transcript of the oral findings and rulings entered by the Superior Court on June 14, 2018 is attached as an exhibit to the Memorandum in Support of Motion of Creditors Joseph E. Corcoran And Gary A. Jennison For Judgment on the Pleadings on Count II of the Complaint (Adv. Pro. No. 20-01045, Dkt. No. 22) filed in connection with the nondischargeability adversary proceeding commented by C&J in this case.

In a separate adversary proceeding commenced by Mr. Mullins, he has objected to the proofs of claims filed by C&J, asserting, among other things, that C&J's claims should be offset by any judgment he obtains on various counterclaims he has asserted. *See* Complaint Dkt. No. 1, Adv. Pro. No. 21-1027.

Massachusetts judgment rate of 12%. *See* Trial Tr. (Day 2 (Lessin)), 13:16–25; Trial Tr. (Day 3

(Mullins)), 183:22–25; Corcoran Proof of Claim 4-3; Jennison Proof of Claim 5; Second

Amended Disclosure Statement as Modified 10, Dkt. No. 335, Trial Ex. 4. The Debtor possessed

sufficient assets to pay the judgments in full, but would have had to liquidate substantial assets.

Trial Tr. (Day 2 (Lessin)), 14:1–10, 15:9–12; Trial Tr. (Day 3 (Mullins)), 184:3–17.  The Debtor

filed this case to avoid a potential forced liquidation by C&J to satisfy the judgments and to

afford the Debtor an opportunity to formulate a plan to address his liabilities.[14] *See* Trial Tr. (Day

2 (Lessin)), 99:20–100:14. The Debtor filed this case in good faith for those purposes.

During the pendency of his case, three limited partnerships in which the Debtor possesses

substantial interests refinanced or obtained lender commitments to refinance affordable housing

properties owned by those limited partnerships because of sizeable appreciation in value

resulting from increased rents. *See* Trial Tr. (Day 3 (Mullins)), 162:8–19, 163:10–164:7, 164:24–

165:8, 186:18–187:3. These refinancing events have resulted or will result in the distribution of

millions of dollars to the Debtor. *See id.* at 162:14–163:17, 186:18–187:3; *see also* Agreed Facts

¶¶ 14–15.  The Debtor's improved cash position has permitted him to propose a Plan that will

permit payment in full of the Debtor's unsecured creditors in Class 6 in as little as 90 days after

the effective date of the Plan, depending on the amount of interest that may be due to those

creditors.  The Debtor would not have to liquidate any assets, other than a vacant lot in Milton,

Massachusetts, to make the payments contemplated by the Plan and would retain more than $50

million in assets. *See* Trial Tr. (Day 3 (Mullins)), 185:20–186:11. When asked on cross

---

[14]  The Debtor may have been concerned that C&J sought to obtain control of certain of the Debtor's
interests in commonly-owned entities through the judicial sale process.

examination about these fortunate postpetition developments, the Debtor appropriately remarked, "That's good news."  Trial Tr. (Day 3 (Mullins)), 163:2, 7, 15–17.

The primary dispute between the Debtor and C&J involves the question of whether the Debtor's significant solvency and the "good news" of the enhancement of the cash assets of this this "fortunate debtor"[15] and his ability to pay creditors in full should inure solely to the benefit of the Debtor or whether these are factors should be considered in determining how much interest must be paid with respect to the rejecting class of general unsecured claims for the Plan to be found to be fair and equitable as to those creditors.

According to the Debtor's projections supporting confirmation of his Plan, Exhibit G to the Darr Report, in the first quarter of 2021, after the Debtor will have repaid one hundred percent of the allowed amount of the Class 6 unsecured claims, the Debtor will have $3,436,787 in cash.[16]  See Darr Report 201.  According to those projections, the Debtor's only remaining liability, once he has paid back his Class 6 unsecured creditors,[17] would be the liability to his secured creditors in the amount of $25,522,316.[18]  See id.; see also Trial Tr. (Day 2 (Lessin)),

---

[15]  *Cf. In re Ultra Petroleum Corp.*, 624 B.R. at 181 ("Bankruptcy relief is intended for the honest, but unfortunate debtor. Although no one questions Ultra's honesty, a post-petition uptick in natural gas prices made Ultra and its shareholders quite fortunate. As a result, Ultra became massively solvent.")

[16]  When asked on cross examination, if "Mr. Mullins were required to pay $2.1 million-a-year of pre-confirmation interest to the unsecured creditors and assuming two-and-a-half years' worth of that interest, even with that additional $5.25 million liability, Mr. Mullins would be able to satisfy that amount by 2022" and "would still have $1.3 million worth of cash," Mr. Darr answered "yes." Trial Tr. (Day 3 (Darr)), 77:24–78:17.

[17]  Assuming that the unsecured reciprocal notes between the Debtor and his children related to the CMJ, Inc. and CMJ Management unsecured shares are roughly equivalent.  *See* Solvency Decision 19–20 n.16.

[18]  The secured creditors of the Debtor are his children, and they have an interest in assisting their father to maintain his interests in various assets. Their secured claims arise from the Debtor's repurchase of 1,550 nonvoting shares of CMJ, Inc. and 90 nonvoting shares of CMJ Management, Inc. that had previously been gifted to them in 2012 and 2013 in exchange for two secured promissory notes in the aggregate amount of $25,522,314. The Debtor repurchased the gifted shares from his children to protect the shares

46:6–17.  By the end of 2022, the Debtor will have in excess of $6.5 million in cash and will

have paid $1.9 million in 2021 and another $2.1 million in 2022 to his secured creditors.  Darr

Report 200.  By the end of 2024, the Debtor will have in excess of $12.25 million in cash and

will have paid back the secured creditors more than $8.25 million since the first quarter of 2021.

*Id*. It seems clear that if the Debtor were required to pay interest to the Class 6 unsecured

creditors at the 12% state judgment rate under his plan, the Debtor would have enough cash to do

that and comfortably meet his ongoing expenses.  Trial Tr. (Day 3 (Darr)), 77:14–78:21, 83:24–

84:5.  The Parties have stipulated that from the petition date through February 1, 2021, state law

interest on the Class 6 unsecured claims is $3,961,396.94, with a per diem amount of $5,813.82

thereafter.  *See* Stipulation by Debtor Joseph R. Mullins and Joseph Corcoran and Gary Jennison

with Respect to the Calculation of Potential Pendency Interest, Dkt. No. 540.

　　　　C&J have argued that, if I determine that the solvent debtor exception is appropriately

considered in determining whether a plan is fair and equitable under § 1129(b), I must require a

plan must provide for payment of postpetition interest at the rate established under state law,

where applicable, with respect to each allowed claim to be confirmed. For C&J that rate is the

state judgment rate of 12%.  In reported decisions applying the solvent debtor exception, most

courts did not engage in weighing of equities or rejected equitable considerations.  As discussed

above, so long as there were sufficient assets to pay all creditors with interest, "rather than

considering equitable principles, courts have generally confined themselves to determining and

enforcing *whatever pre-petition rights a given creditor has against the debtor*."  *Dow III*, 456

F.3d. at 679 (citing *In re Chi, Milw., St. Paul & Pac. R.R. Co.*, 791 F.2d at 528, *Ruskin*, 269 F.2d

---

from potentially being repurchased by C&J at a discounted value if the Debtor filed for bankruptcy. *See*
Solvency Decision 19–20 n.16.

at 831, and *Debentureholders*, 679 F.2d at 269) (emphasis added)); *cf. In re D.C. Sullivan & Co.*, 929 F.2d at 6 (concluding that "[a]bsent overriding equitable considerations," IRS entitled to postpetition interest on its lien and non-lien clams at the applicable rate set forth in 26 U.S.C. § 6621 for delinquent taxes).  Some decisions do characterize the payment of postpetition interest as a matter of equity, subject to "overriding" or "countervailing" equitable considerations, even where the court did not engage in such a balancing to determine an applicable rate of interest different from the rate to which the creditor was entitled under applicable non-bankruptcy law.  *See, e.g., Vanston*, 329 U.S. at 165; *In re D.C. Sullivan & Co.*, 929 F.2d at 6; *Debentureholders*, 679 F.2d at 269; *In re Beck*, 128 B.R. 571, 573 (Bankr. E.D. Okla. 1991) ("The scale balancing the equities . . . is overwhelmingly tilted toward restoring the creditor to as near a position as the creditor would have occupied absent bankruptcy before benefiting the Debtors with surplus funds."); *see also*, *In re Ultra Petroleum Corp.*, 624 B.R. at 198–99 (collecting cases).

Few pre-Code or post-Code cases discuss the authority of a court to determine an appropriate rate of interest in applying the "fair and equitable" standard based on the facts and circumstances of the case.  *See, e.g., In re  Chi., Milw., St. Paul & Pac. R.R. Co.*, 830 F.2d 758, 764 (7th Cir. 1987) (in railroad reorganization case, affirming decision that the pre-Code "fair and equitable standard" gave the district court discretion to confirm a plan of reorganization that paid the IRS less than its statutory rate of interest and holding that the fact that the railroad proved to be solvent "was not dispositive of whether the government should receive a statutory rate of interest on its tax claim; [i]t is only a prerequisite to the award of any interest at all"); *Fed. Sav. & Loan Ins. Corp. v. D & F Constr. Inc. (In re D & F Constr. Inc.)*, 865 F.2d 673, 675 (5th Cir. 1989) (holding that the "fair and equitable" standard requires "consider[ation of] the

entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances"); *Debentureholders*, 679 F.2d at 270 (holding in a solvent debtor case that the plan was "unfair and inequitable because [it] . . . does not provide in exchange for the creditor's contractual right [to compound interest] just compensation").

It is the Debtor's burden to demonstrate that a plan is "fair and equitable" to holders of general unsecured Class 6 claims. *See, e.g.*, *In re Salem Suede, Inc.*, 219 B.R. at 932 (holding that the plan proponent in a non-consensual plan bears the burden of proof on confirmation requirements under § 1129 by a preponderance of the evidence). Use of the term 'includes' in § 1129(b)(2), allows a court to weigh equitable considerations in deciding whether to award post-petition interest in determining whether a plan is fair and equitable to a dissenting class. *Cf. In re Energy Future Holdings Corp.*, 540 B.R. at 118 (observing, in *dicta*, that the plain meaning of § 1129(b) does not require a debtor to pay postpetition interest to the holder of an allowed unsecured claim in an objecting class, but that the Code provides discretion for the court to require payment of such interest as a condition to confirmation and that "[e]xercise of the Court's discretion will vary on a case by case basis and must be based on an evidentiary record"). The rate of interest may be the applicable contract rate or such other rate as I deem appropriate based on the evidentiary record, but the weight of authority dictates that, absent strong equitable considerations, state law contract rates should dictate the rate of interest required to be paid in solvent debtor cases for a plan to be fair and equitable with respect to a class of dissenting unsecured creditors.

In this case, the claims of C&J are based on a final state court judgment as to which state law provides for post-judgment interest at a rate of 12% per annum. The rationale supporting application of contract rates, presumably negotiated prepetition at arm's length by a debtor, in

solvent debtor cases does not fit as neatly with judgment interest provided by state statute.

Contract interest, including default rates, is negotiated and is intended to compensate a creditor

for the time value of funds that are owed by a debtor.  In the case of a default rate of interest,

these contractual terms provide a disincentive to default, but also compensate a creditor for

additional risk and administrative burden.  In this case, the Massachusetts judgment rate is

substantially greater than what the evidence shows to be a market rate for the post-effective date

period, assuming a payoff from available cash within 90 days, and may be higher than negotiated

default rates in commercial transactions.  The record in this case contains no evidence regarding

a rate that would reflect an assessment of risk during the pendency period.

In assessing whether the Debtor has met his burden, I have considered evidence in the

record establishing the Debtor's projected financial position on the effective date of the proposed

plan, both on a balance sheet basis and considering available cash.  The Debtor will emerge with

very substantial assets and available cash.  The Debtor's post-effective date projected cash flow

is sufficient to maintain his business interests and lifestyle, even if C&J were paid in full with

interest at the Massachusetts judgment rate.  I have also considered (i) the conduct of the parties

in relation to this case, which, while contentious, was a neutral factor in this determination and

did not otherwise point to any bad faith concerns in proposal of the Plan, (ii) the damages

awarded by the state court arising from the Debtor's breach of fiduciary duties, (iii) the delay in

paying the C&J claim that allowed the Debtor to avoid liquidation of assets in order to be in a

position to propose a plan that will pay his creditors in an organized manner, (iv) the source of

additional cash assets from refinancing projects in which the Debtor participated as an investor,

rather than being generated by actions of the Debtor; (v) the demonstrated inclination of the

Debtor's children and related entities to assist the Debtor in avoiding liquidation of assets; (vi)

the benefits of a successful reorganization to the Debtor and his children; (vii) the ability of the

Debtor to operate his business and continue to enjoy the same standard of living with no material

impairment or apparent risk of further reorganization if he paid interest to C&J at the

Massachusetts judgment rate; and (viii) my findings that Class 6 creditors would be paid in full

with interest in a hypothetical liquidation.  After considering these factors, based on the record in

this case, I find that the Plan does not meet the fair and equitable standard and, to satisfy this

standard, the Debtor must propose an amended plan of reorganization that pays the C&J claims

in full with interest for the pendency and post-effective date periods at the Massachusetts

judgment rate.[19]

## D.   DID THE DEBTOR SATISFY THE "BEST INTERESTS TEST" OF § 1129(a)(7)(A)(ii)?

Section 1129(a)(7)(A)(ii), the "best interests test," permits a plan to be confirmed,

notwithstanding rejection by an impaired class, if each holder "will receive or retain under the

plan on account of such claim or interest property of a value, as of the effective date of the plan,

that is not less than the amount that such holder would so receive or retain if the debtor were

liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A)(ii). Where an

estate is liquidation solvent, the distribution "waterfall" established under § 726(a)(5), which is

made applicable to this case by § 1129(a)(7), requires postpetition interest to be paid on all

allowed unsecured claims "at the legal rate" from the petition date until the payment of such

claims. 11 U.S.C. § 726(a)(5) (stating "property of the estate shall be distributed . . . fifth, in

---

[19] In determining the appropriate interest rate for the pendency and post-effective date periods, I considered whether the federal judgment rate would be an appropriate rate because it most easily corresponds to the statutory scheme, but rejected that rate as being too low in relation to the state judgment rate because the Debtor has a clear ability to pay interest at the state judgment rate and to apply the federal judgment rate in cases like this could promote solvent debtor bankruptcy filings to avoid statutory interest rates provided by state law.

payment of interest at the legal rate from the date of filing of petition on any claim . . . .”). The

requirement to provide for payment of postpetition interest in a plan where a Chapter 11 debtor is

liquidation solvent is not controversial, but the rate of interest to be used is unsettled as the

Bankruptcy Code does not define “legal rate.”

I have determined that the Debtor is solvent on a hypothetical liquidation basis as

reflected in the Solvency Decision, finding that the proceeds of a hypothetical liquidation yield

sufficient proceeds to pay holders of Class 6 claims in full.  As such, the Plan may not be

confirmed in its present form because it does not provide for the payment of any pendency

interest on allowed general unsecured Class 6 claims.[20]  The Debtor has stated on the record that

he would modify the Plan to provide for pendency interest at the federal judgment rate.

Courts are divided as to the meaning of “the legal rate.” The majority of courts that have

considered the meaning of “the legal rate” as used in § 726(a)(5) in published decisions have

concluded that “the legal rate” to be applied is the federal judgment rate established by 28 U.S.C.

§ 1961.  *See, e.g., Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231, 1235 (9th Cir. 2002)

(concluding that “‘interest at the legal rate’ is a statutory term with a definitive meaning that

---

[20] The Debtor argues that strong evidence supports his projections that Class 6 creditors will be paid in full within 90 days of the effective date of the Plan.  The Debtor asserts that I should consider the time value of money and the likely delay in distributions that would occur in a hypothetical Chapter 7 (presumably some estimated internal rate of return for each creditor compared against additional pendency interest that would accrue during the Chapter 7 liquidation process) to determine that the real “value, as of the effective date of the plan” that will be received by Class 6 creditors is actually not less than holders of such claims would receive on account of their claims in a hypothetical liquidation – notwithstanding that the Plan does not require the payment of any pendency interest.  While it is inviting to weigh the value of a likely payment of a dollar in 90 days against the “value” to the holder of an unsecured claim of a payment of a dollar, plus additional pendency interest, with some risk in 12–24 months, I decline on this record to accept that invitation.  There is insufficient evidence in the record regarding this type of valuation and analysis, and I did not make any downward adjustments to orderly liquidation value on that basis in the Solvency Decision.  I also note that the language of the statute could be read to restrict an analysis that includes the time value of distributions in a hypothetical Chapter 7 case over time since it references “the amount that [creditors would] receive or retain if the debtor were liquidated under chapter 7” on the “effective date of the plan.” 11 U.S.C. § 1129(a)(7)(A)(ii).

cannot shift depending on the interests invoked by the specific factual circumstances before the

court"); *Beguelin v. Volcano Vision, Inc. (In re Beguelin)*, 220 B.R. 94, 101 (B.A.P. 9th Cir.

1998) (determining that the "[u]se of the federal judgment rate for all creditors in a case provides

bankruptcy trustees with an efficient and inexpensive means of calculating the amount of interest

to be paid to each creditor"); *In re Energy Future Holdings Corp.*, 540 B.R. at 113–14 (adopting

federal judgment rate as the legal rate of interest under §§ 726(a) and 1129(a)(7)); *Branch*

*Banking & Trust Co. v. McDow (In re Garriock)*, 373 B.R. 814, 816 (E.D. Va. 2007)

("review[ing] each line of cases [and recognizing] that 'the legal rate' refers to the federal

judgment rate, and does not encompass . . . any lawful pre-petition contract rate."); *In re*

*Adelphia Commc'ns Corp.*, 368 B.R. 140, 257 (Bankr. S.D.N.Y. 2007) (concluding that "[i]t is

by far the better view, in my opinion, that 'legal rate' is the federal judgment rate and not the

same as that authorized under section 506(b), which is the contract rate."); *In re Best*, 365 B.R.

725, 727 (Bankr. W.D. Ky. 2007) (examining the authority regarding "legal rate" under §

726(a)(5) and concluding "[t]he more recent cases hold that the federal judgment rate is the

proper rate of interest under 11 U.S.C. § 726(a)(5)"); *In re Country Manor of Kenton, Inc.*, 254

B.R. 179, 182 (Bankr. N.D. Ohio 2000) (holding entitlement to postpetition interest under §

726(a)(5) refers to uniform rate that could not be based upon contractual agreement to such

interest); *In re Dow Corning Corp. ("Dow I")*, 237 B.R. 380, 412 (Bankr. E.D. Mich. 1999)

(determining that the phrase "interest at the legal rate" means the federal judgment rate); *In re*

*Gaines*, 178 B.R. 101, 106 (Bankr. W.D. Va. 1995) (finding that "treatment of post-petition

interest and the rate of interest should parallel Chapter 7 proceedings" and that the rate of interest

under § 726(a)(5) is the federal legal rate"); *In re David Green Prop. Mgmt.*, 164 B.R. 92, 99

(Bankr. W.D. Mo. 1994) (noting "[t]he legal rate, to be paid holders of allowed unsecured claims

before any proceeds are returned to Debtor, means the federal judgment rate under 28 U.S.C. §

1961"). These courts have considered (1) principles of statutory interpretation; (2) uniformity

within federal law; (3) equitable treatment of creditors; and (4) judicial efficiency in concluding

that the application of the federal judgment rate is the legal rate contemplated under § 726(a)(5).

*See, e.g., In re Cardelucci*, 285 F.3d at 1236 (recognizing that even on occasions when a debtor

may receive a windfall, the uniform application of the federal judgment rate to calculate

postpetition interest to unsecured creditors is a more efficient and fair and equitable outcome

than applying each creditors' contractual rate or the applicable state law judgment rate, which

varies state-by-state); *Dow I*, 237 B.R. at 407 (determining that a uniform rate "keeps the

bankruptcy estate from being saddled with potentially difficult and time-consuming

administrative burdens" of determining what rate is applicable to each creditor's claim).

  In *Dow I*, the court concluded that the phrase "at the legal rate" in § 726(a)(5) should be

interpreted as a reference to the federal judgment rate and that this was the appropriate rate of

interest to be used for purposes of applying the "best interests" test. *Dow I*, 237 B.R. at 295.  In

rejecting that any applicable contract rate should apply, the court reasoned that an allowed claim

under § 502 was the equivalent of a money judgment awarded on the date of the petition, such

that interest is a matter of federal law which requires uniformity. *Id*. at 386–88. The court viewed

that Congress choosing not to incorporate the language "interest on claims allowed," was

significant because that language, as comments in the related legislative history indicated, was

meant to "be determined by other applicable law." *Id*. at 403; *see also* 11 U.S.C. § 506(b)

(example where congress explicitly intended application of a contract rate, providing that if a

secured creditor is over-secured, the creditor shall be entitled to "interest on such claim . . .

provided for under the agreement or State statute under which such claim arose").

35

The Ninth Circuit Court of Appeals also determined that the principles of statutory interpretation supported the conclusion that Congress intended the phrase "interest at the legal rate" to mean the federal judgment rate. *See In re Cardelucci*, 285 F.3d at 1234–35. The Ninth Circuit also reasoned that applying the federal judgment rate promotes bankruptcy goals of "fairness among creditors and administrative efficiency." *Id*. at 1236.

In contrast, other courts have determined that "the legal rate" can mean the rate agreed in the contract between the debtor and the creditor (even the default rate if dictated by the balance of the equities in a particular case) or other rates determined by state law rights. *See Dow III*, 456 F.3d at 671 (applying contract rate in reconciling best interests with fair and equitable test under § 1129(b) because "all parties ought to be granted the benefit of their bargains, unless the equities compel a contrary result"); *Colfin Bulls Funding A, LLC v. Paloian (In re Dvorkin Holdings, LLC)*, 547 B.R. 880, 893 (N.D. Ill. 2016) (conceding that "[w]hile *Cardelucci* is well-reasoned, the Court [was] not convinced that, by using the phrase 'at the legal rate' in section 726(a)(5), Congress intended for the Federal Judgment Rate to apply to all unsecured claims for post-petition interest, even when there is a surplus estate . . . [or that] Congress intended to replace the pre-Code rule that in cases involving a surplus bankruptcy estate, the bankruptcy court should enforce creditors' rights according to the tenor of the contracts that created those rights.") (quotation omitted)); *In re Fast*, 318 B.R. 183, 191–192 (Bankr. D. Colo. 2004) (in a surplus Chapter 7 case, finding that "the equities do not support application of an interest rate other than that as contracted by the parties"); *In re Beck*, 128 B.R. at 573 (defining "at the legal rate" to mean the interest applicable absent bankruptcy and noting "[t]he scale balancing the equities in this matter is overwhelmingly tilted toward restoring the creditor to as near a position as the creditor would have occupied absent bankruptcy before benefitting the Debtors with

surplus funds"). In *Dvorkin Holdings, LLC*, the court found no clear evidence in in § 726(a)(5) of

congressional intent to abandon the "solvent debtor exception"[21] recognized in pre-Code cases or

to impose a uniform rate of pendency interest.  547 B.R. at 893–94. The *Dvorkin* court concluded

that the creditor in that case was entitled to postpetition interest at its contract rate, noting that "in

the case of a chapter 11 surplus bankruptcy estate that is large enough to pay in full all unsecured

creditors' claims plus postpetition interest, section 726(a)(5) does not limit a creditor with a valid

contract to the Federal Judgment Rate." *Id.* at 898.

For the reasons referenced by the majority of courts considering this issue, statutory

interpretation principles, uniformity within federal law, equality of treatment amongst similarly

situated creditors and efficiency, the term "the legal rate" used in § 726(a)(5) is best interpreted

in most cases to be the federal judgment rate established by 28 U.S.C. § 1961.  It is not

insignificant that Congress used the phrase "payment of interest at *the* legal rate" in § 726(a)(5)

(emphasis added).  *See Adelphia Commc'ns*, 368 B.R. at 257; *Dow I*, 237 B.R. at 405–06

(holding that use of term "legal" as opposed to "contract" rate mandated conclusion that

Congress meant "a rate fixed by statute").

---

[21]  As previously discussed, under § 502(b)(2), unsecured creditors are generally not allowed to collect
any unmatured interest. When the debtor is solvent, having sufficient assets to pay all claims in full,
courts have historically applied the solvent debtor exception to allow unsecured creditors to collect
postpetition interest. *See, e.g., In re D.C. Sullivan & Co.*, 929 F.2d at 3 ("There is a long line of cases
holding that postpetition interest should be paid where the estate becomes solvent"); *Debentureholders*,
679 F.2d at 269 (recognizing that the solvent debtor exception requires a court to enforce the parties' state
law contractual rights, even for unsecured creditors); *see also In re Ultra Petroleum*, 624 B.R. at 184
(examining the viability of the solvent debtor exception where the claims of unsecured creditors are
"unimpaired" and concluding "Congress did not silently abandon that fundamental equitable principle
when it passed the Bankruptcy Code" and that the appropriate rate of interest is the contractual default
rates to mirror what creditors must be paid what they are owed under the contract before the debtor may
receive a windfall).

.

In considering the most logical construction of that phrase to refer to a singular rate of interest in the context of the legislative goal of uniformity in treatment of similar claims and consolidated, efficient administration of bankruptcy proceedings, it is easy to conclude Congress intended that "the legal rate" would be the federal judgment rate. The administrative burden on bankruptcy courts to determine other potentially applicable rates could be substantial and result in increased costs and delays in administration of Chapter 7 cases.  Additionally, applying contract rates, judgment rates, and other potential rates determined under state law could result in disparity among similar creditors where certain creditors receive smaller distributions on § 726(a)(5) claims and bear a greater burden because of delays in administration of Chapter 7 cases than other creditors who receive higher pendency interest rates.

C&J argue that this Court has discretion where a debtor is determined to be solvent to interpret "the legal rate" to be the state judgment rate applicable to their claims as an extension of the "solvent debtor exception" recognized prior to enactment of the Code.  Because of my rulings regarding application of the "fair and equitable" requirements of § 1129(b) and the relationship of those requirements to "best interests" test of § 1129(a)(7)(A)(ii), it is not necessary for me to explicitly decide in this case whether, when a debtor is liquidation solvent, a rate of interest higher than the federal judgment rate might constitute "the legal rate" for purposes of § 726(a)(5) as applied by § 1129(a)(7)(A)(ii)[22] or whether a more general "solvent debtor exception" might dictate that result.

---

[22] For example, if a class of equity interest holders or subordinated creditors were to object to confirmation of a plan of reorganization that provided for a senior class of unsecured creditors to receive interest on allowed claims at a rate higher than the federal rate on the basis that interest holders or subordinated creditors would receive less under the plan than they would in a liquidation because interest should be paid at the federal judgement rate, such an objection could be overruled in a solvent debtor case on the basis that "the legal rate" as applied through the best interests test should be interpreted as any rate

## IV.    <u>**CONCLUSION**</u>

For the reasons set forth above, I will enter an order denying confirmation of the Plan

in its present form and set a status conference to address ancillary objections and the filing of an

amended plan of reorganization.  As recognized above, other courts may have ruled differently

on the legal issues presented by this case, but until controlling appellate authority or a statutory

amendment dictates otherwise, I interpret the provisions of the Code to incorporate and

implement the "solvent debtor exception" established over the course of hundreds of years of

insolvency jurisprudence.

By the Court,

Dated: July 13, 2021

_____
Christopher J. Panos
United States Bankruptcy Judge

---

of interest established by the Court that would be necessary to be paid under a plan of reorganization for
that plan to be fair and equitable under § 1129(b) as to a senior class of dissenting creditors.